**H. SCHINDLER & CO., Inc., v. C. SALA-DINO & SONS, Inc.**

**No. 3106.**

Circuit Court of Appeals, First Circuit.

March 23, 1936.

MORTON, Circuit Judge, dissenting.

———◆———

Nathan Heard, of Boston, Mass. (Herman Loewenberg, of Boston, Mass., on the brief), for appellant.

Harold E. Cole, of Boston, Mass., for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from the District Court of Massachusetts holding invalid a patent, No. 1,970,376, granted to Walter J. Hamburger on August 14, 1934, and dismissing the complaint against the defendant-appellee for infringement, although the District Court found that, if valid, the defendant had infringed the patent.

The patent involved a process for making tennis strings of silk, with what is termed a "perfect spiral"; that is, with a strand of a different color from the body of the string, and displaying a visible spiral, regularly spaced, on the outside of and the entire length of the string.

The District Court held that, in view of the prior art, the process employed by the plaintiff-appellant in obtaining what is termed the "perfect spiral" was a mere exercise of mechanical skill, and did not constitute invention.

Silk strings for tennis rackets have come into use only within the last twelve or fifteen years. Prior to that time the strings for rackets were usually made entirely of gut. In making strings of gut, which contains in itself a natural binder, the method is different from that when made of silk. In the manufacture of silk tennis strings a slow drying colloidal binder is used, which remains tacky, or sticky, for some length of time after immersion in it, or a sufficient length of time to allow the several strands of silk to be twisted into a single string and to be bound closely together.

Gut strings for tennis rackets were usually made in their natural color. After silk came into use for the purpose, a popular demand arose for a strand of a brighter color than that of the body of the string, to be wound helically outside the body of the string and at regular intervals.

It seems to be clear from the evidence that, notwithstanding this demand, until the process perfected by Hamburger for meeting this demand, that is, of twisting a colored strand so that it would appear on the outside of the body of the string in a regular or perfect spiral, no one had succeeded in accomplishing this result. Previously, in twisting the colored strand with the strands comprising the body of the string, it would disappear for a time within the body of the string and appear at irregular intervals, and the result was unsatisfactory. The process claimed by Hamburger is described generally in his specifications and testimony as follows:

In thus assembling the identifying strand and the cord-like structure, said strand is laid in position alongside of the cord-like structure forming the body of the string, under less tension than that to which the cord-like structure is subjected. The assembled cord-like structure and identifying strand are then twisted from end to end to give the final structure the required twist, and because of the fact that the identifying strand is under less tension than the strands forming the body of the string, said identifying strand will remain on the outside of the body of the string as the twisting takes place and will not become buried inside at any point during the twisting operation.

The plaintiff, as assignee of the Hamburger patent, contends that the process by which it produces a perfect spiral has the element of novelty; that it was an advance in the art; that it met a demand of the public, and has all the elements of an invention.

The defendant contends that, granting that it produced a perfect spiral and met a public demand, the method described in

the claims of the patent was merely the application of what would be apparent to any skilled workman in adapting the prior art to the end sought to be obtained, but that certain devices, or their equivalents, used by the plaintiff in accomplishing the result and that were essential thereto, were not included in the claims of the patent.

█ █ While it is true that the granting of a patent by the Commissioner of Patents carries with it a presumption of validity, if the prior art is not adequately cited in the file wrapper, the presumption is weakened; and the presumption is overcome if an essential element or step in the process is omitted from the claims of the patent. Boynton v. Chicago Hardware Foundry Co. (C.C.A.) 77 F.(2d) 799, 801; International Flatstub Check Book Co., Inc., v. Young & Selden Co. (C.C.A.) 284 F. 831, 832.

We think the District Court was right in holding, in view of the prior art and what is common knowledge, that to cause a strand of different texture or color to be spiraled or wound helically about a cord by twisting, it must be longer and under lesser tension, if it is to remain on the outside of the cord.

The defendant contends that what the patentee—who admits he knew these facts from his student days and from the efforts being made in the prior art to obtain a perfect spiral—discovered was that, in addition to the obvious steps in the claims of his patent beyond the prior art, it was also convenient, if not essential, in perfecting his process that the vessel containing the liquid colloidal mixture should have two rollers over which the strands of silk were to pass, and that part of the bottom roller over which the strands intended to form the spiral passed should be larger than that over which the strands intended to form the body of the string passed, and this resulting in longer strands for the spiral than for the body of the string; and that a second step, which was essential to a successful result of his process, was attained by passing the strands of silk intended to form the string through the larger opening of the trumpet or funnel-shaped device, and the strands of silk intended to form the spiral through a smaller opening, but finally leading into the same channel through which the strands forming the body of the string passed just before it emerged from the small end of the funnel, by means of which they came out of the small end of the funnel side by side in the form of two cords, and assembled in the proper relation; the cord for the spiral being under lesser tension than the cord forming the body of the string.

Although efforts had previously been made without success to produce the so-called perfect spiral by arranging the strands for the spiral by hand alongside or together with the body of the string, or by placing it below the strands composing the body of the string, and under lesser tension, according to the testimony of Hamburger the result produced by laying the strands forming the cord for the spiral "progressively" alongside the cord intended for the body of the string under lesser tension, and in the manner it came from the trumpet, was an essential step in producing the perfect spiral.

Originally the trumpet device was included in a claim under this patent, but was canceled subject to applicant's right to file a divisional application.

While Hamburger admits that, prior to the invention of the patent in suit, it was old to twist the web formed by the folding or the gathering together of the body strands separate and apart from the spiral strands in order to twist them together, and thereby form a tennis racket string, the part played by the trumpet in his process was emphasized by him as appears in his testimony:

"X-Q. 16. Do I understand you right that naturally, if the identifying strand is smaller in diameter and lighter than the body of the string, it will be under lesser tension without particularly trying to make it so? A. No.

"X-Q. 17. Didn't you say so? A. No; I said that in pulling the body strand and the identifying strand through the trumpet the fact that the body strand was between your finger * * * and the trumpet, and the identifying strand was between the same two fixed points, namely, your finger and the trumpet, due to the differences in size and the surface of the area presented, in thus passing through the trumpet a difference in tension would be created at the point of contact. The difference in tension was a lesser tension on the identifying strand. That comes just naturally from the process of bringing the two strands together.

"X-Q. 18. And when they were making your old string, prior to your alleged in-

vention, how did they avoid [why didn't they get] that natural result which you have described, of having the identifying strand under less tension? A. Because they did not pass it through a trumpet.

"X-Q. 19. It was passing it through a trumpet which accomplished this lesser tension? A. And passing it through separately and apart from the rest of the strand.

"X-Q. 20. You mean, passing it through the little hole at the side of the trumpet? A. Yes. It is introduced, as I explained earlier, in a different fashion, at a separate place, into the cylinder, and out of the cylinder that contains the impregnating medium. That was not the case in the old strings."

In further emphasizing the importance of the trumpet in his process he stated:

"I formed a web of parallel strands, placed them through a binding solution, maintained them in the form of a parallel web until they reached a longitudinal position, when they were fed into a trumpet-like device and folded into the general shape of a cord, the fibres still being essentially parallel, into a rolled up, cord-like structure. And while they are passing through this tube there is progressively laid alongside of this group of body strands a single identifying strand or marker strand, and that strand is laid alongside the group of body strands which form the web, and [the identifying strand] having been formed into the general shape of a cord is laid at the point of contact under a lesser tension than that to which the body strands have been subjected, and this group of body strands with the identifying strand adhering thereto emerges from the trumpet in their assembled relation. Then the string is cut to its proper length and the entire assembly is twisted from end to end to form the string."

The importance of the rollers in the pot and the essential function of the trumpet in producing the desired result as an integral part of the Hamburger process is also emphasized in the testimony of the plaintiff's witness Raymond, a former employee of the plaintiff, and who learned the method in use at the plaintiff's factory, and who afterwards in 1932 left its employ and went to work for the defendant company and taught the defendant how to obtain the perfect spiral in a silk tennis string. He described the method in use at the factory of the defendant when he went there to work substantially as follows:

The pot machine in use by the defendants which carries the adhesive binding material through which the strands were drawn, had just a couple of brass rods with a roller underneath, and a rubber to draw the silk up through to take up the surplus of the solution. Both the colored and white strands as they passed out of this pot machine from the top roller were flat, that is, in a flat band as they came out of the machine. That flat band of strands was put on a racket—stretcher, they called it, or racks, either one, and then twisted.

He then stated: "For a period after I started to work there they were making perfect spirals of these silk tennis strings."

The following questions and answers in the examination of the witness then took place:

"Q. 1. How did they come to make the perfect ones? A. Well, the way I showed them.

"Q. 2. Until you showed them how to make them, were they making any perfect spirals? A. No, sir.

"Q. 3. That is, during the time that you were in the employ of the Saladinos, from the time you were there up until the time you showed them, as you say, how to do it, were they making any perfect spiral tennis strings? A. Not to my knowledge, they were not making perfect spiral strings."

He further testified:

"The job led me to show the Saladinos this process. Mr. Saladino, Joseph Saladino, asked me to show it to them. He just asked me to show them how to make them; how to make the spiral string. He knew that I had been with the Schindler Company.

"The first thing that I did in showing them how to make these spiral tennis strings, I showed them on the 21-foot string. They had to get particular machinery, had to get this tube here, (referring to the trumpet) and had to get a pot machine. I got the pot machine out in Medford. They had the pot machines, but they were antique as far as that was concerned. The bottom roller of the pot machine was not right, and you neces-

sarily have to have the two rollers on a machine in order to make it right on the top. The trouble was, you take your bottom roller, and one place on the roller is larger in diameter than the other, and that is what takes your colored silk in order to get it longer, and that gives you the perfect spiral. The machines which the defendant had did not have the right kind of rollers on them."

"I did not make a trumpet. I did not make it for them. They obtained these tubes from Cundy-Bettoney located on Chestnut Avenue, Jamaica Plain. They ordered them from Cundy-Bettoney because I told them. I told them where they could get them and what to get. I told them they could get them from Cundy-Bettoney because that is where the Schindler Company had had its trumpets made. After they had obtained these trumpets from Cundy-Bettoney Company, we were able to make perfect spiral tennis strings."

In cross-examination this witness added:

"With respect to this method used in making tennis racket strings covered by the patent in suit, it was necessary to use the funnel, Exhibit 7, in making these perfect spiral strings."

By the funnel the witness referred to the device sometimes described as a trumpet.

And, again, as to the necessity of having a pot machine of the type he described, the witness said:

"In order to make tennis racket strings of silk by this new process, it was necessary to use what I call the pot machine with the rolls that Schindler used. I found that necessary when I worked at Schindler's. By that I am referring now to the string made by the method shown in this patent in suit."

"The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." Permutit Co. v. Graver Corporation, 284 U.S. 52, 52 S.Ct. 53, 55, 76 L.Ed. 163.

And in Stelos Co. v. Hosiery Motor-Mend Corporation, 295 U.S. 237, 55 S.Ct. 746, 747, 79 L.Ed. 1414, the court said:

"We think the method claim is bad for want of proper disclosure and as lacking invention. * * * Nowhere does the claim or the specification disclose the element that the fabric must not be tautly stretched over the holder, or that it must be so held that the tension can be varied. It is said that the use of the present participle 'stretching' rather than the past participle 'stretched' makes the matter clear; but scrutiny of both claim and specification discloses no teaching as to the stretching of the fabric, or any regulation of the tension, or that it may not be tightly stretched over the holder and secured in that condition prior to commencing the repair. The specification of a 'suitable' holder certainly covers none of these alleged essentials. These omissions emphasize the failure to make the fair disclosure demanded by R.S. § 4888 [35 U.S.C.A. § 33]."

While there is a reference in the specifications to the trumpet or funnel as a convenient device for forming the strands into a cord and for laying those intended for the spiral alongside the body of the string, yet no reference is made therein that it was essential to secure the perfect spiral, as plaintiff's witnesses Hamburger and Raymond both stated. The court in Altoona Public Theatres v. American Tri-Ergon Corporation, 294 U.S. 477, 55 S.Ct. 455, 459, 79 L.Ed. 1005, said:

"As none of the flywheel claims as drawn define an invention, none can be aided by reading into it parts of the specifications, or of other claims, which the patentees failed to include in it."

While the specifications and drawings may be referred to to explain or make clear the claims of a patent, they cannot insert something into the claims which is not there.

The claim on which the plaintiff chiefly relies reads as follows:

"2. The method of making a tennis string or the like which consists in forming a web of parallel strands laid in a colloidal binder, folding said web longitudinally into the general shape of a cord, laying an identifying strand along one side of said folded web under less tension than that to which the strands of the web are subjected, said identifying strand being

laid while the binder material is still tacky so that said identifying strand adheres to the folded web, and then twisting the folded web and identifying strand to make the completed string, said identifying strand, because of its lesser tension, remaining on the peripheral surface of the twisted string but spiralling thereabout and being visible throughout the length of the string."

There is no reference here to the trumpet, or funnel, or the part the two rollers, over which the strand forming the colored spiral passed, played in preparing the spiral for use in the process.

█ If the Hamburger patent is confined to the claims, as it must be, we think it contains no invention or advance over the prior art. The patentee should have stated the essential steps of his process in his claims. What he discovered was that, by running the strand forming the spiral over a larger portion of a roller than that over which the body strands were run and, after squeezing off the surplus colloidal mixture, by running the strands forming the body of the string and that intended to form the spiral through a trumpet or funnel-shaped arrangement, through separate channels, coming out of the smaller end of the funnel, side by side in the form of two cords, and thus laid progressively alongside each other, and still in a tacky condition so that they adhered to each other in this assembled relation, the cord intended for the spiral being longer and at lesser tension than the cord intended to form the body of the string. As a result, when twisted the spiral remains on the outside of the body of the string throughout the entire length and in the form of a perfect spiral.

The process set forth in the claims does not include the steps essential to the process discovered by Hamburger. We think the process described in the claims, as the District Court found, contained no appreciable advance over what had been done before; at least, no advance which was not obvious to any skilled workman, and did not involve invention. As stated by the witness Raymond, and admitted by the patentee Hamburger, it required the employment of the trumpet in conjunction with the rollers in the pot to secure the exact lesser tension and longer spiral strand for the cord and the regularity of application of the spiral strand to the body strand, while in a tacky condition, to obtain a perfect spiral when the twisting is

done. Any manual arrangement of the strands before twisting has not secured a regularity of the spiral on the outside of the body string, which Hamburger obtained by the use of the trumpet and the specially constructed roller in the pot containing the colloidal mixture, which according to the testimony are essential to secure the perfect spiral.

The decree of the District Court is affirmed, with costs to the defendant.

BINGHAM, Circuit Judge (concurring).

The real questions in this case are: (1) Whether the claims of the patent include the steps of the patentee's process; and (2) whether the claims, in view of the prior art and what was generally known and practiced, are too broad and therefore invalid.

The plaintiff's contention is that its patentee devised a new and patentable method of producing a tennis string. This may be conceded. But the evidence given by the plaintiff's witnesses was that its tennis string, with its spiral distinctive strand, can only be produced by passing the web of threads, after submission to a colloidal mixture, through the cylinder of a trumpet, and by passing at the same time the distinctive thread, after like treatment, through a portion of the cylinder of the trumpet along beside the rolled web, while in a tacky condition; the distinctive thread being under less tension than the threads of the web. This special method of rolling the web and placing the distinctive or spiral strand along beside and attaching it to the rolled cord is nowhere alluded to in the claims. Being an essential step in the process and not alluded to in the claims, the claims can avail the plaintiff nothing.

Then again, if the claims, by any stretch of the imagination, could be said to include the steps of the plaintiff's process, they are too broad when considered in the light of the prior art and what was well known and practiced, and consequently are invalid.

MORTON, Circuit Judge (dissenting).

I regret that I am unable to agree It seems to me that the decision does real injustice to a meritorious invention.

The problem was to make a twisted string of silk having a certain colored strand wound in an even spiral on the out-

side of it throughout its length. It had never been done until the patentee accomplished it. His method was copied by the defendant, his chief competitor, before the patent was out of the office and is still being used by the defendant. No other way of accomplishing the desired result is known. In the face of these facts it is held that the patent did not involve invention.

Yarns and strings are generally made on twisting-spindles, or similar machinery, several strands being brought together and twisted into one. The result which Hamburger had in mind could not be obtained in that way because it was impossible in that process to control the final position of the identifying strand and keep it on the outside of the completed string. He solved the problem by resorting to an entirely different principle. Prior patents on twisted strings made in that way are not pertinent to the present question; nor are those dealing with strings formed by winding a wire or a yarn on a central cord. Hamburger's process goes back to the method used in making rope or cable, in which the different strands forming the cable are laid together parallel for the full length of the cable and are then twisted together. Many persons will remember the long rope-walks often seen near maritime cities. Hamburger, instead of feeding his silk strands to a twisting device to be made into a string, began by laying them out straight side by side in a flat web. The strands of a cable are held in position by their surface friction against each other. Silk fibers are not sufficiently rough on the surface to be worked in that way; they will not hold their positions and interlock with each other, as manila or cotton will. Hamburger caused the silk strands to hold together by running them through a bath of adhesive. He did this while they were in the form of a flat web so as to give each fiber an even coating. Then he bunched or rolled the flat web, wet with adhesive, into a round string and pulled it out straight ready to be twisted. It was, of course, possible to have introduced a colored fiber into the web and to have twisted it with the web; but if this had been done the colored thread would have appeared in the completed string in a hit and miss way, not as a regular spiral around the outside of it—which was what it was desired to accomplish.

The way in which Hamburger solved this part of the problem was as follows:

When the wet fibers were bunched into round form referred to as a "cord," he stuck on one side of the cord lengthwise a strand or fiber of the desired color. The cord was stretched tauter than the colored strand and the latter was therefore longer than the fibers to which it was attached, as it had to be in order to take a position on the outside of them when the bundle was twisted. At this point the process seems to me nothing short of brilliant in its recognition of the difficulties involved, and in how each could be overcome by means which were capable of being united into an effective process. The whole bundle was then twisted into a completed string. The initial position of the colored strand on the outside of the round form, its additional length and less tension, acted together to keep it on the outside during the twisting and brought it into a regular spiral on the completed string; and the exuded glue twisted out of the cord fibers assisted in retaining the colored strand and providing a finishing coat for the completed string.

To say that this process did not involve invention because banjo strings had been made of wire wound around a cord, or paper and yarn had been twisted together in various ways, seems to me to miss the point of Hamburger's invention entirely.

I am still less able to see that he was at fault for not more fully describing his invention. What I have said is merely an elaboration of the claim in suit; and I venture to believe it is quite enough to enable a person skilled in the art to work the Hamburger process. It was the Patent Office which compelled him to divide his application and patent separately the "trumpet" or "funnel" used as a mechanism in carrying it out. In the majority opinion it is said "that the process of the patent * * * contains no appreciable advance over what had been done, etc." It is, however, certain that Hamburger did something which had never been done before, which nobody knew how to do before, and which nobody to-day—so far as the record shows—knows how to do any other way. In my opinion, it is a brilliant little patent, the second claim of which is clearly good and clearly infringed.