LYOPHILE-CRYOCHEM CORPORATION
et al. v. CUTTER LABORATORIES,
Inc.

No. 26970–R.

District Court, N. D. California, S. D.

Aug. 9, 1948.

See also 78 F.Supp. 903.

Naylor & Lassagne and Theodore H. Lassagne, all of San Francisco, Cal., and Frank E. Barrows and Roger T. McLean, both of New York City, for plaintiffs.

Mellin & Hanscom, Oscar A. Mellin, LeRoy Hanscom, and Jack E. Hursh, all of San Francisco, Cal., for defendant.

YANKWICH, District Judge.

The counterclaim and cross-claim of the defendant, Cutter Laboratories, Inc., seeking a declaration of rights against the plaintiff, heretofore tried, argued and submitted, is now decided as follows:

I

■ On stipulation of counsel, declaration is ordered in favor of the defendant that the Barr Patent, Letters Patent No. 2,353,986, is invalid.

II

■ Declaration is ordered in favor of the plaintiffs that Reichel Reissue Patent No. 20,969 and Florsdorf Patent No. 2,345,548 are, and each of them is, valid and infringed as found by the verdict of the jury returned and filed on July 31, 1948. The court adopts the verdict of the jury as to the claims submitted to them, and finds that the other claims in said two patents not submitted to the jury are also valid. The court makes no finding as to the infringement of any of these claims, as no such issue was framed as to them.

III

The court finds that the plaintiffs have not used and are not now using the monopoly granted by the Letters Patent or either of them improperly to create a monopoly upon or to control the supply of unpatented substances and apparatus, and have not used and are not now using the said patents or either of them contrary to the public interest and/or contrary to law; and orders declaration to that effect.

IV

The court finds that the defendant is not entitled to injunctive or any other equitable relief against the plaintiffs or any of them.

Counsel for the defendant are directed to prepare findings and decree on the counterclaim and cross-claim, under local Rule 5(e).

Comment

■ A study of the so-called "patent pooling" agreements confirms me in the impression I received at the trial that these agreements are not in unreasonable restraint of trade or commerce under the Sherman Anti-Trust Law, 15 U.S.C.A. § 1; and do not tend to substantially lessen competition, or to create a monopoly under the Clayton Act, 15 U.S.C.A. § 14.

I have had occasion in two recent opinions filed in my own district on June 7 and 21, 1948 (United States v. Standard Oil of California, 78 F.Supp. 850) to review the latest decisions of our highest courts interpreting these statutes. Those opinions and others on the same subject

written in past years by me and referred to therein, contain a detailed analysis of the leading cases on the subject of monopoly arising from the misuse of patents or other practices. So I need not elaborate here. For our purpose, it is sufficient to state that the contracts under consideration fall into that group of agreements among owners of patents, which our highest courts have sustained as legitimate exercises of the control incident to the patent monopoly. See, Standard Oil Co. v. United States, 1931, 283 U.S. 163, 51 S. Ct. 421, 75 L.Ed. 926; Transparent-Wrap Mach. Corporation v. Stokes & S. Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563; Sbicca-Del Mac v. Milius Shoe Co., 8 Cir., 1944, 145 F.2d 389, 399. For they merely involve consolidation of patents for mutual advantage and a division of spheres of activity, which assigns to one of the subsidiaries the role of holding the patents and dealing in the licenses, and to the others the production of the materials under the processes of the pooled patents. They are clearly what I have designated as "contracts in the nature of joint ventures" entered into for mutual benefit and protection. They are legitimate exercises of the rights conferred by the patent monopoly. More, the evidence in the record shows conclusively that not only were the products manufactured under the process to be supplied to other laboratories, but that their trade was actually solicited. Indeed, the contracts themselves called for the granting of licenses to outsiders. To illustrate: The agreement of February 2, 1941, between Sharp & Dohme and Stokes contains the following clause.

"4. The parties agree as prospective shareholders of the new corporation to cause said corporation to grant licenses to others on such terms as, consistently with the maintenance of the strength of its patent rights and the good reputation of the products made pursuant to the patents, shall encourage maximum sales of the products and minimize sales resistance, and such licenses shall not be unreasonably withheld."

And the contracts with the subsidiary denominated "X" contain similar clauses.

There is no restraint upon the use of unpatented materials or attempts to control the materials which go into the process of the type which the courts have condemned. Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Masonite Corporation, 1942, 316 U.S. 265, 62 S. Ct. 1070, 86 L.Ed. 1461; Mercoid Corporation v. Mid-Continent Company, 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. So the contracts involved here cannot and did not result in any of the evil practices which the Anti-Trust laws denounce, or which the courts have disapproved. Hence, the rulings above made.