## CUTTER LABORATORIES, Inc. v. LYO-PHILE–CRYOCHEM CORPORATION et al.

### No. 12083.

United States Court of Appeals
Ninth Circuit.

Dec. 27, 1949.

Rehearing Denied Jan. 30, 1950.

Leonard S. Lyon, Leonard S. Lyon, Jr., Richard F. Lyon, Los Angeles, Cal., for appellant.

Theodore H. Lassagne, San Francisco, Cal. (Frank E. Barrows, Roger T. Mc-Lean, W. B. Morton, Jr., New York City, of counsel), for appellee.

Before HEALY, BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellees brought this action for damages for the infringement of Reichel Reissue Patent No. Re. 20,969 and Flosdorf et al., Patent No. 2,345,548. By a bill of particulars, the charge of infringement was limited to claims 6, 11, 12 and 13 of the Reichel patent, and claims 4 and 5 of the Flosdorf patent. Judgment for damages and costs was entered upon a jury verdict that each of these claims was valid and had been infringed by appellant and assessing damages at $70,922, or two per cent of the stipulated amount of net sales of appellant's allegedly infringing products.

Appellant, in addition to denying the validity and infringement of the patent claims, set up the equitable defense that appellees were attempting to use the patents to create a monopoly over unpatented products and in other ways to restrain trade contrary to the public interest, and coun-

terclaimed, asking a declaratory judgment that all of the claims of the two patents were invalid, were not infringed, and for an injunction against further infringement suits by appellees. The District Court rendered a separate decree on the equitable defense and counterclaim, 78 F.Supp. 905, adopting the verdict of the jury as to the validity and infringement of the claims involved in the action for damages, declaring the other claims of the two patents to be valid, and that appellees had not misused the patents.

## A. The Reichel Patent.

### 1. Validity.

The Reichel Patent describes a process for preserving sera, and other biologically active substances, by extracting the moisture therefrom and leaving them in lyophilic form, dry and porous. They can be kept thus for long periods of time, during which they can be reconstituted by the addition of the amount of water originally removed without the loss of their original biological properties. The first step in the process, as described, is to subject the liquid serum or other biological product to "substantially instantaneous freezing." This can be done by freezing the substance in a thin layer on the inside of a container which is immersed in a very cold refrigerant such as liquid air or dry ice (both of which are colder than –70° C.). It is suggested that substantially instantaneous freezing of a sizable quantity of liquid material may be best assured by adding it to the container in installments, each installment forming a thin layer that will quickly freeze through on contact with the preceding layer, which will previously have reached a very low temperature through the action of the refrigerant. The container is then removed from the refrigerant and connected with a condenser, which is another chamber surrounded by a refrigerant, and the condenser is in turn connected with a very high-vacuum pump. Through the action of the pump, as high as possible a vacuum is maintained in the container and condenser, the effect of which is to "sublime" the ice in the frozen charge, that is, to transform the ice directly into water vapor without its passing through the liquid state at all. The vapor thus formed and removed from the frozen charge is collected in the form of ice in the condenser. The sublimation process may be expedited by subjecting the container to warm air or a warm bath, but the container must never be warmed to such an extent as to melt or even soften the frozen material. After the visible ice has been removed from the material, there still remains residual moisture which may adversely affect the keeping qualities; to effect the removal of this residual moisture the application of the high vacuum is continued until container and its contents attain a temperature substantially above 0° C., or room temperature.

The parties agree that the Reichel process can be analyzed into five steps: (1) freezing the substance; (2) subjecting it to a high vacuum; (3) adding heat to the substance while under the vacuum, (4) without melting or softening the substance; (5) continuing to apply the vacuum until the substance has reached a temperature substantially above its freezing point. Of the thirteen claims in the Reichel patent, only claim 9, a product claim, and claim 10, a process claim, include the entire five-step process. Both of these specify freezing through exposure to a refrigerant –70° C. or colder. Only claims 6, 11, 12 and 13 were held valid in the infringement action, neither of which specifies the complete process. Claims 6 and 12 specify "quickly freezing" the substance in a container, removing water vapor from the solidly frozen substance under a high vacuum, and hastening the removal of the water vapor by exposing the container to the atmosphere or to a bath substantially above 0° C. without melting or softening the frozen material.[1] Both these claims omit

1. Claim 6. "The method of obtaining lyophilic sera and other biological substances which comprises quickly freezing the same to a solid frozen state in a container, removing water from the solid frozen material under a high vacuum, condensing the water vapor removed from the material in the form of ice and applying sufficient heat to the solid frozen material during the removal of water

the step of continuing the application of the vacuum after sublimation of the ice until the substance is substantially above 0° C. Claims 11 and 13 specify subjecting the substance to "substantially instantaneous freezing", removing the water by the application of a high vacuum while maintaining the material in a solid state, and continuing the application of the vacuum until the material is substantially above 0° C.[2] These claims omit the step of heating the frozen material by exposing the container to the atmosphere or a warm bath.

■ That none of the claims in the infringement action includes the entire Reichel process is not necessarily fatal to their validity. The inventor of a multistep process may be entitled to separate patents, as well as separate claims within the same patent, for subcombinations of steps representing only part of the entire process. Such sub-combination claims may be necessary to prevent others from impairing the value of the entire invention by appropriating an essential part thereof. Special Equipment Co. v. Coe, 324 U.S. 370, 65 S.Ct. 741, 89 L.Ed. 1006. But each sub-combination claim, to be valid, must meet the requirements of a separate patentable invention. Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S.

477, 55 S.Ct. 455, 79 L.Ed. 1005. Even though a claim does not embody the ideal whole of the invention as described in the patent specification, it must encompass a process which is operable in itself and which by itself has the qualities of invention and novelty. Rodman Chemical Co. v. Deeds Commercial Laboratories, 7 Cir., 261 F. 189; H. Schindler & Co. v. C. Saladino & Sons, Inc., 1 Cir., 81 F.2d 649.

■ We cannot upset the jury's findings that claims 6, 11, 12 and 13 were each valid unless "the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict * * *." Brady v. Southern Ry., 320 U.S. 476, 479-480, 64 S.Ct. 232, 234, 88 L.Ed. 239. Claims 6 and 12 specify, (1) "quickly freezing," (2) application of a high vacuum, (3) addition of heat by exposing the container to the atmosphere or a warm bath (4) without melting or softening the frozen material. It is generally agreed that it was old in the art to desiccate biological materials by freezing them and drying them under a high vacuum. Appellees base the patentability of these claims on the application of heat to the frozen material under vacuum without the melting or softening thereof. Dr. Leake, appellee's expert, testified that

therefrom by exposure of the container to the atmosphere or to a bath maintained at a temperature substantially above 0° C. to hasten the evaporation of water without melting or softening the frozen material."

Claim 12. "The process of obtaining lyophilic sera and other biological substances which comprises quickly freezing liquid serum or other biological substance in a container in contact with the wall thereof and removing water from the resulting solidly frozen substance under a vacuum sufficient to remove water vapor from the frozen material without softening or melting thereof and continuing to remove water under said vacuum while exposing the container to the atmosphere or to a bath maintained at a temperature substantially above 0° C., whereby heat flows to said material by conduction from the wall of the container."

2. Claim 11. "The method of obtaining lyophilic sera and other biological sub-

stances which comprises subjecting liquid serum or other biological substance to substantially instantaneous freezing by indirect contact with a refrigerant maintained at a temperature below the freezing point of the substance, and removing water from said material by the application of a high vacuum thereto while maintaining the material in a solid state, and continuing the application of the high vacuum until the substance attains a temperature substantially above 0° C."

Claim 13. "The method of obtaining lyophilic sera and other biological substances which comprises subjecting liquid serum or other biological substance to substantially instantaneous freezing and removing water from said material by the application of a high vacuum thereto while maintaining the material in a solid state, and continuing the application of the high vacuum until the substance attains a temperature substantially above 0° C."

the maintenance of a solid condition while applying heat was new on the part of Dr. Reichel. On cross-examination he was confronted with a number of articles, published before the development of the Reichel process and describing freeze-drying processes in which the material was apparently to be kept frozen solid throughout the process. The most striking of these articles was one written by Dr. James Craigie called "Method of Drying Complement from the Frozen State," appearing in Vol. 12 of The British Journal of Experimental Pathology in 1931. The article prescribed freezing the material and then leaving the apparatus at room temperature. It says, "No further supervision is necessary for the complement will remain frozen until dry because the evaporation of the water automatically keeps it several degrees below 0° C." It also lists as one of the advantages of the described process the fact that the material is automatically kept below 0° C. until perfectly dry. On being asked to reconcile his views with these articles, Dr. Leake readily admitted that Dr. Reichel had not been the first one to keep the material frozen solid during sublimation. All that Dr. Leake claimed for Dr. Reichel was that the latter was the first one to stipulate the maintenance of the solid condition as a necessary requirement. Although Dr. Leake undoubtedly considered this stipulation to be a major and inventive contribution, it was not sufficiently inventive to validate claims 6 and 12 under patent law. Where a process has been fully disclosed in the prior art without full appreciation of all its valuable attributes, the perception of new advantages in the old process does not in itself constitute invention. General Electric Co. v. Jewell Incandescent Lamp Co., 1945, 326 U.S. 242, 247–249, 66 S.Ct. 81, 90 L.Ed. 43; Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242, 248.

▮ Claim 12, however, contains a further limitation which, when read in the light of the proceedings in the Patent Office, is sufficient to support a finding of validity. Claims 12 and 13 were not in the original Reichel patent, but were added in the reissue. The file wrapper of the reissue patent shows that the patent examiner at first rejected claim 12 as originally presented, on the ground that it had been anticipated by the Craigie article, described above. The applicant thereupon amended claim 12 to specify that the frozen substance was to be in contact with the inside of the wall of the container and that the heat absorbed from the atmosphere or warm bath to which the container was exposed should flow to the frozen material by conduction from the wall of the container, an arrangement fully disclosed in the descriptive portions of both the original and the reissue patents. It was pointed out by the applicant that Craigie, and also Shackell, another reference, exposed the container to the warm atmosphere, but they suspended the frozen material away from the inside of the container wall, thereby insulating it from the heat, instead of causing the heat to flow directly through the wall and into the material by conduction. Since the Patent Office allowed the amended claim 12 without further objection, it can be inferred that the Office considered the amendment to have created a patentable distinction over Craigie. Nothing appears in the record to rebut the presumption thus raised that the conduction of heat through the container wall was an inventive, patentable improvement. The finding that claim 12 is valid must, therefore, be affirmed.

▮ This limitation as to the method of adding heat does not appear in claim 6. If that claim is to be upheld, we must find in it some other patentable improvement over the old process. It might be asserted, although appellees did not so assert on this appeal, that claim 6, as well as claim 12, marked a patentable advance over the prior art by specifying "quickly freezing." Dr. Reichel, the patentee, testified by deposition that he considered his main contribution to the art through this patent to be the step of quick or instantaneous freezing, which he said meant freezing at –70° C., in contrast to slower freezing at higher temperatures. But assuming that that step does represent a patentable advance, freezing the material by a refrigerant at –70° C. or colder is specified in claims 1, 2, 3, 4.

9 and 10 of the patent. Claims 6 and 12 specify only "quickly freezing." And rapid freezing had already been shown to be desirable by the Elser Patent No. 1,970,956, pp. 3, 4. "If we can be satisfied from the specification and a comparison of the claims that a particular claim was intended and had for its dominant purpose to secure and protect the use, in the combination, of one particular feature, we should give its fullest permissible effect for that purpose, and should not construe it as specific also in its calls for other elements—unless some other rule of construction requires us to do so." Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210, 215. A comparison of the claims discloses that the function of claims 6 and 12 was to secure a patent monopoly over the steps of adding heat during the sublimation process without softening or melting the frozen material, regardless of the method of "quickly freezing." [3] The reason and the necessity for mentioning "quickly freezing" were to place the assertedly inventive addition to the process, the application of heat without melting or softening the frozen material, within that phase of the old art in which such inventive steps would be operative and useful, giving those steps the broadest patentable scope. See Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775, 782. This objective would be unnecessarily defeated if the freezing step of the claims were to be limited, through reference to the specification or otherwise, to freezing with a refrigerant –70° C. or colder. In any event, the narrowing of the claims by reference to the specification would be improper. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535.

◼ Nor can invention be found in the specification in claim 6 that the water vapor removed from the frozen material under the high vacuum is to be condensed in the form of ice. This feature is fully anticipated by the Elser Patent No. 1,970,956. Claim 6, therefore, is invalid.

Claims 11 and 13 specify, (1) substantially instantaneous freezing, (2) application of a high vacuum, (3) maintaining the material in a solid state, (4) continuing the application of the vacuum until the substance is substantially above 0° C. Dr. Leake's testimony is amply sufficient to establish step (4) as new in the art of freeze drying biological materials in such a way that they can be reconstituted with their original biological properties by the addition of water. The processes pointed to by appellant in the prior art for drying prunes and other food products under vacuum at temperatures above 0° C. do not invalidate claims 11 and 13 because those processes did not and were not designed to preserve delicate biological properties important in sera or plasma. In fact, none of the prior procedures referred to by appellant for drying under vacuum at temperatures above 0° C. was in combination with freezing the substance to be dried, a step shown to be essential to effective preservation of such delicate properties. We cannot say that it was unreasonable to find patentable invention in the discovery that freeze-dried biological materials would lose none of their potency and would keep for longer periods if the residual moisture were extracted under vacuum at substantially above 0° C., even though vacuum drying at such temperatures was, by itself, well known for drying food products.

◼ The omission of the step of adding heat does not invalidate claims 11 and 13. It is true that the omission of an essential step in a process claim invalidates the claim. H. Schindler & Co. v. C. Saladino & Sons Co., 1 Cir., 81 F.2d 649; Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co., 2 Cir., 210 F. 164. But the addition of heat, while ideally a part of the Reichel process, is not shown to be an absolute essential. Certainly the phrase, "and continuing the application of the high vacuum until the substance attains a temperature substantially above 0° C.", implies that somehow the substance will reach that temperature, and the claim may properly cover

---

**3.** This interpretation is reinforced by the proceedings in the Patent Office discussed below in connection with the problem of indefiniteness.

a sub-combination including the application of the vacuum under that circumstance no matter how the circumstance may be brought about.

Appellant contends that the phrase "substantially instantaneous freezing" in claims 11 and 13 is too indefinite and therefore invalidates the claims under the rule of General Electric Co. v. Wabash, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, and United Carbon Co. v. Binney and Smith, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, which this court followed in Vitamin Technologists v. Wisconsin Alumni Research Foundation, 9 Cir., 146 F.2d 941. But the indefiniteness proscribed by those cases is that which would discourage invention by making uncertain the extent of the patent monopoly. It is not the function of claims 11 and 13, any more than it is the function of claims 6 and 12, to claim a new method of freezing as inventive, for the freezing step is claimed in other claims specifying the use of a refrigerant –70° C. or colder. "Substantially instantaneous freezing" in claims 11 and 13, as well as the phrase "quick freezing," in claims 6 and 12, can reasonably be construed to refer not to a new inventive step but to the old, well known step of freezing as a condition necessary to the usefulness of the rest of the claimed combination. This interpretation is reinforced by the patentee's own explanation of what he wished to claim during the Patent Office proceedings recorded in the file wrapper of the original Reichel patent No. 2,066,302, of which the patent in suit is a reissue. On page 43 of the file wrapper, the patentee states: "The process involves two steps, namely, the freezing step and the desiccation step, which are best discussed separately, as each is believed to be new and patentable, and of course the combination of these two steps, that is, the complete process, is believed to be new and patentable." On page 94, in the final communication to the Patent Office before allowance of the patent, the patentee states that the following appear to be two of the three fundamental questions raised by the proceedings:

"2. Is applicant entitled to claim broadly the process of desiccation or dehydration in which the initial step of freezing is carried out by indirect exposure to a refrigerant maintained at –70° C. or colder, without reference to the temperature at which the surroundings of the container are maintained during dehydration?

"3. Is applicant entitled to claim broadly the process of dehydration of a frozen serum or the like which involves subjecting the serum or the like to a high vacuum while in a frozen state and while exposing the container containing the frozen material to a temperature substantially above 0° C. during the dehydration, or at least, continuing the application of the high vacuum until the material within the container reaches a temperature substantially above 0° C., whether the container is exposed to room temperature or a warm bath during the entire period of dehydration or not, irrespective of whether the material is initially frozen at –20° C. or –70° C. or any other temperature?"

▉ At the time of these arguments in the Patent Office there were no other claims more suitable than the present claims 11 and 13 for claiming "continuing the application of the high vacuum until the material within the container reaches a temperature substantially above 0° C. * * * irrespective of whether the material is initially frozen at –20° C. or –70° C. or any other temperature." While arguments in the file wrapper cannot be used to expand the scope of claims, they can be used to affirm a construction, permissible by the wording of the claims, as according with the intentions of the inventor and the Patent Office. Texas Co. v. Anderson-Prichard Refining Corp., 10 Cir., 122 F.2d 829, 840. Construing "substantially instantaneous freezing" as referring to an old rather than an inventive step, the phrase is sufficiently precise. Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775, 782. Claims 11 and 13 are therefore valid.

▉ In addition to claims 6, 11, 12 and 13, upheld by the judgment in the infringement action, we have before us claims 1, 2, 3, 4, 5, 7, 8, 9 and 10, held valid in the declaratory judgment which was rendered by the court in response to appellant's

88

counterclaim and from which there is also an appeal. Claim 5 is so similar to claim 6 as to be also invalid. The distinction, if any, between claims 5 and 6 pertains to the means of disposing of the water vapor sublimed from the frozen material. In both cases the method specified is condensing the vapor into ice, a method fully anticipated by Elser Patent No. 1,970,956. Claims 8, 9 and 10 all specify continuing the application of the vacuum until the substance reaches a temperature substantially above 0° C. and therefore are valid on the same ground as claims 11 and 13. The other claims specify particular methods of freezing: claims 1 to 4 specify freezing by indirect exposure to a refrigerant of –70° C. or colder and claim 7 specifies freezing in thin layers. Dr. Reichel testified that he considered his method of freezing the chief contribution of his process to the art, and appellant, so far as the record shows, presented no evidence to rebut the presumption of validity given these claims by the fact of their being patented. Hence, we affirm the findings of their validity.

### 2. Infringement of Claims 11, 12 and 13.

Appellant has a commercial laboratory in which it manufactures lyophilic biological products by a process very similar to the one set forth in the Reichel patent. The only part of appellant's process that appellant relies upon as avoiding infringement of claims 11, 12 and 13 is the method of freezing. The table in the footnote [4] portrays the time and the temperature of the refrigerant used in preparing each of the products of which the jury found the sale to be infringing. Appellant contends that the phrases "quickly freezing" and "substantially instantaneous freezing", in claims 11, 12 and 13, must, if they are to have any meaning at all, be interpreted, first, as freezing at –70° C. in installments, as recommended by the patent specification and the claims not alleged to be infringed, and, second, by the statement of Dr. Reichel that "quick" and "instantaneous" freezing meant freezing just as rapidly as possible. Appellee points out that the rate of freezing is a relative matter dependent on many factors and that in the file wrappers the patent examiners described prior processes, in which refrigerants no colder than –20° C. were used, as "quickly" or "substantially instantly" freezing. Be that as it may, we do not see how the product constituting 79% of appellant's allegedly infringing sales, penicillin, taking 4 to 12 hours to freeze in

| [4] FREEZING RATE OF CUTTER LABORATORIES PRODUCTS. | | | |
|---|---|---|---|
| Product | Freezing Time | Temperature (Centigrade) | Percent of total net sales |
| Human plasma | 15–18 min. in 500cc bottles 25–28 " " 320cc " | –20° to –60° | 2% |
| Typing serum A | | –20° to –60° | ½% |
| Typing serum B | | –20° to –60° | ½% |
| Penicillin | 4–12 hrs. in trays 2–16 hrs. in small bottles | –20° to –30° | 79% |
| Anti RH typing serum | 3–5 hrs. in trays ½–1 hr. in small bottles | –20° to –40° | 1⁄10% |
| Fiber Foam | 1–3 hrs. in –20°C. box 50 min. to 1 hr. in –40° box | –20° to –40° | 2% |
| Human albumin | 4–6½ hrs. | –20° to –40° | 5% |
| Hypertussis | – – – | –20° to –40° | 6% |
| Immune serum | 3–5 hrs. in trays 50 min. to 2 hrs. in small bottles | –20° to –40° | 3% |
| Thrombin | 1½ to 2 hrs. in trays 50 min. to 2 hrs. in containers | –20° to –30° | 1⁄5% |
| Fowlpox vaccine | 2–7 min. | –60 to –70° | 1% |
| Laryngeo tracheitis vaccine | 2–7 min. | –60° to –70° | 1% |
| Ovine ecthyma | 2–7 min. | –60° J –70° | 1⁄10% |

trays and 2 to 16 hours to freeze in small bottles with a refrigerant of –20° to –30° C., can be said to be frozen quickly or substantially instantaneously.

Appellant did not automatically escape infringement by keeping his processes outside the literal language of the claims. As we have construed claims 11, 12 and 13, they are not to be read as claiming a particular method of freezing as an inventive step; that is the function of other claims. Appellant admittedly has practiced on all his products the steps of applying heat by conduction through the wall of the container and of continuing the application of the vacuum until the material is well above 0° C. These steps are the heart of the inventive subcombinations of claims 11, 12 and 13. Appellant has merely replaced substantially instantaneous freezing with slower methods of freezing well known in the prior art. There is nothing to show that appellant achieves any substantially different or improved result by the slower method as compared with the results achieved by the Reichel process. Appellant has used all the inventive elements of the claims and, in place of another element, quick freezing, used a substitute well known at the time of the invention, slower freezing. Cf. Pedersen v. Dundon, 9 Cir., 220 F. 309; Cazier v. Mackie-Lovejoy Mfg. Co., 7 Cir., 138 F. 654. It has long been established that such a substitution does not avoid infringement. Gill v. Wells, 22 Wall. 1, 89 U.S. 1, 15, 28-32, 22 L.Ed. 699.

Appellant invokes the doctrine of Keystone Bridge Co. v. Phoenix Iron Co., 95 U.S. 274, 24 L.Ed. 344, that no limitation which a patentee puts into his claim may be ignored, whether or not the limitation was necessary to validate the claim. See also, Fay v. Cordesman, 109 U.S. 408, 3 S.Ct. 236, 27 L.Ed. 979. One reason for this rule is to give notice to possible infringers of the claim's limits; another is to relieve the courts of the burden of deciding just what elements are material to the validity of the claim. But where attempts are made to avoid infringement by a relatively slight, well known variation

in the claimed process or product, the strict rule is relaxed by the doctrine of equivalents. "Without that doctrine every claim is indeed entitled to be interpreted in the light of the specifications as a whole, and not to be read merely with a dictionary. But often even with the most sympathetic interpretation the claim cannot be made to cover an infringement which in fact steals the very heart of the invention; no matter how auspiciously construed, the language forbids. It is then that the doctrine of equivalents intervenes to disregard the theory that the claim measures the monopoly and ignores the claim in order to protect the real invention. Claude Neon Lights v. Machlett & Son, 2 Cir., 36 F.2d 574; see also, Otis Elevator Co. v. Atlantic Elevator Co., 2 Cir., 47 F.2d 545, 547; Oates v. Camp, 4 Cir., 83 F.2d 111, 116." Keith v. Charles E. Hires Co., 2 Cir., 116 F.2d 46, 48.

In the present case the jury was instructed that "infringement is to be found when the accused operation accomplishes substantially the same result by substantially the same means as does the patented invention." Under the circumstances, the verdict of infringement was not unreasonable.

The damages for infringement were predicated upon findings that claims 6, 11, 12 and 13 had been infringed. Although claim 6 cannot be sustained, the jury could not have found from the evidence that either of appellant's processes infringed claim 6 without at the same time infringing claims 11, 12 and 13; hence, the invalidity of claim 6 cannot affect the amount of damages awarded.

### B. The Flosdorf Patent.

Claims 4 and 5 of Flosdorf et al., Patent No. 2,345,548 were found to be valid and infringed and the entire patent declared valid. The Flosdorf patent is an improvement in the method of getting rid of water vapor which is sublimed from the frozen material under the vacuum in the course of the process described in the Reichel patent. At the very high vacuum specified in the Reichel process, water va-

por is produced in such large quantities that an ordinary vacuum pump of economic size cannot pump out the vapor and still maintain the prescribed degree of vacuum. This is true not only because of the large quantities of vapor but also because as the vapor reaches the pump it mixes with the lubricating and sealing oil, impairing the pump's efficiency. The prior method of obviating these difficulties has been either to place within the vacuum chamber chemical desiccants capable of absorbing the vapor in large quantities or, as described in the Reichel patent, to connect to the vacuum chamber one or more cold condensers, maintained at a very low temperature and capable of condensing the water vapor into ice. The desiccants or condensers prevent the vapor from reaching the pump and thus make it possible to maintain an extremely high vacuum with a pump of ordinary capacity. The descriptive portion of the Flosdorf patent recites these facts and then states as a discovery of the patentees that if the vapor is pumped directly out of the chamber instead of being absorbed by condensers or desiccants, not nearly so high a vacuum is required for the proper desiccation of the frozen biological material. To pump out directly the vapor produced at the lower pressure requires a pump of only one 4500th the capacity of a pump which would be necessary if the vapors produced at a degree of vacuum previously thought necessary were to be pumped out directly. The patent then goes on to describe in elaborate detail three different mechanical arrangements, two involving vapor-handling pumps and the third, a steam ejector, for pumping the vapor out directly.

The only claims of this patent which the jury found valid and infringed are claims 4 and 5, the text of which appears in the footnote.[5] Appellant argues that the only element of invention in these claims appears in the last phrase of each: "pumping the moisture out of said sealed space ['high vacuum space' in claim 5] in vapor form without condensing it or absorbing it in a desiccant within said space at the same rate as it is evaporated from the frozen mass ['as fast as it is produced' in claim 5]." As thus worded, contends appellant, the claims are invalid because they merely state the objective or result of the invention without specifying how that result is to be brought about, thereupon attempting to monopolize every possible means for bringing about the result instead of just the means discovered by the patentee.

▌ If, as appellant contends, the invention in this patent lay in new types of pumps, capable of handling vapor, the claims would indeed be invalid as the mere statement of a result under the rule of Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. But appellant has completely misconstrued the nature of the invention. An examination of the file wrapper, especially pages 41-44, 52-54, and 59-60, shows that the applicants freely conceded that there was nothing new in the types of vapor-handling pump and steam ejector which they were proposing to use to pump out the vapor. The root of their invention, they said, was the discovery that it was possible to desiccate frozen biological material at a much lower degree of vacuum if the vapor were pumped out directly. Previous workers in

---

5. Claim 4: "The process of desiccating substances of the class consisting of biological materials, pharmaceuticals and food products which consists in freezing the material to a solid mass, subjecting the frozen mass to a vacuum in a vapor-tight sealed space to cause evaporation of moisture from the frozen mass, and pumping the moisture out of said sealed space in vapor form without condensing it or absorbing it in a desiccant within said space at the same rate as it is evaporated from the frozen mass."

Claim 5: "The process of desiccating substances of the class consisting of biologicals, pharmaceuticals and food products which consists in subjecting such materials while in a frozen state to vacuum in a high vacuum space to cause evaporation of moisture from the frozen mass, and pumping the moisture out of said high vacuum space in vapor form without condensing it or absorbing it in a desiccant within said space as fast as it is produced."

the art had considered the requirement of an extremely high vacuum as axiomatic and therefore had considered vapor-handling pumps out of the question because they would have to have prohibitively large capacities. Thus the patent was granted not for the invention of a vapor-handling pump or steam ejector but for the combination of well-known types of pumps and ejectors with the likewise well known freeze drying process. The Patent Office must necessarily have decided that this new combination was inventive because it was based on the discovery of the feasibility of lower vacuums. Thus we have a case in which the validity of the claims lies in "the fact of combination rather than the novelty of any particular element." Faulkner v. Gibbs, 338 U.S. 267, 70 S.Ct. 25. The novelty of the claim is not in the pumping of vapor out of a vacuum space as fast as it is produced without the use of desiccants or chemicals; it is in doing that in connection with the desiccation of frozen biological products. The particular type of vapor-handling pump or ejector used is immaterial.

Appellant has attacked claims 4 and 5 only on the ground that they state the result of an invention instead of the invention. The claims are not invalid on that ground. Faulkner v. Gibbs, supra. Appellant has made no showing that the combination represented by the claims was anticipated by the prior art so as to lack invention. Therefore the finding that the claims are valid is affirmed.

There was evidence that some of defendant's processes infringed both claims 4 and 5 and that some infringed neither claim. The finding of the jury was merely that claims 4 and 5 of the Flosdorf patent, and certain claims of the Reichel patent, had been infringed. It is not required in order to sustain the findings that there be substantial evidence that both patents were infringed in the manufacture of all the products on the net sales of which damages were based, so long as there is evidence that the manufacture of all such products infringed either one patent or another. Since there is evidence that the manufacture of all the products infringed the

Reichel patent, the amount of damages assessed cannot be disturbed. It is possible that the jury took into account the non-infringement of the Flosdorf claims by some of defendant's processes in fixing the percentage of net sales, on which damages would be assessed, at two per cent.

The other claims of the Flosdorf patent, numbered 1, 2 and 3, were held valid in the decree on the counterclaim. Appellant made no serious attempt at the trial to contest these claims and has not urged their invalidity in its briefs or oral argument on this appeal. The findings of validity as to these claims are therefore affirmed.

### C. Equitable Defense of Alleged Misuse of Patent.

Appellant urges that appellees have used the patents in suit "to create improperly a monopoly upon and control the supply of unpatented substances and apparatus, and have used and are now using the said patents contrary to the public interest and contrary to law, * * *."

Appellant introduced in evidence a series of licensing and other agreements. Prior to the execution of these agreements, Sharp & Dohme, Inc., a corporation engaged in the manufacture and sale of drugs, owned a series of patents on processes, products, containers and machinery within the field of freeze-dried drugs, including the Reichel patent in suit. The F. J. Stokes Machine Co., which manufactures machinery and apparatus used in the manufacture of drugs, owned a similar series of patents, including the Flosdorf patent in suit. These two companies formed the appellee Lyophile-Cryochem Corporation, to which they agreed to transfer the exclusive power to issue licenses under all patents within the freeze-dried drug field which each party then owned or might in the future acquire, and they agreed to endeavor to acquire such patents from any of their employees who might be connected with new inventions within the field. They also agreed to cause the new corporation "to grant licenses to others on such terms as, consistently with the maintenance of the strength of its patent rights and the

good reputation of the products made pursuant to the patents, shall encourage maximum sales of the products and minimize sales resistance, and such licenses shall not be unreasonably withheld."

Lyophile-Cryochem then granted to Sharp & Dohme a non-exclusive, royalty-free license to make, use and sell all medical products, as distinguished from machinery or apparatus for manufacturing the same, covered by the patents. Sharp & Dohme was also licensed to use patented machinery and apparatus and to manufacture the machinery for its own use but not for sale. Stokes was given an exclusive license, subject only to rights given Sharp & Dohme, to manufacture and sell the patented machinery. Under the agreements, outsiders could obtain licenses for the use of the machinery.

Subsequently, Sharp & Dohme assigned the Reichel and other patents to the appellee Essdee Patents, Inc., its wholly owned subsidiary. Similarly Stokes assigned the Flosdorf and other patents to appellee Tabor-Olney Corporation, its wholly owned subsidiary. Both assignments were subject to the agreements with Lyophile-Cryochem Corporation.

▉▉▉▉ Patent pools and cross-licensing agreements, when formed in a legitimate manner for legitimate purposes, are not illegal in themselves. Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926. Nor is an agreement to assign patents on future inventions within a specified field inherently illegal. Transparent Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. It is only where the agreements are used to effect a restraint of trade or a monopoly that they violate the law, as where they are used to fix prices, United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, or to suppress competition from unpatented articles, Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, or to monopolize an entire industry by pooling the dominating patents and allocating fields of manufacture among companies which would otherwise be in competition. Hart-

ford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322.

There is no evidence of restrictive practices on the part of Lyophile-Cryochem in the granting of licenses. Any would-be licensee appears to have been able to procure just the licenses he wished, and no more, at reasonable, non-discriminatory royalties without making any agreements as to pricing or as to the use or sale of unpatented articles. Nor did Stokes or Sharp & Dohme make any such agreements with Lyophile-Cryochem or between themselves. Appellant does not assert otherwise. Its contention is that the agreements on their face restrain trade and effect a monopoly, especially when coupled with the testimony of the vice president and general manager of Lyophile-Cryochem that the patents in the pool "fairly well cover the field" of freeze-drying drugs. The manner in which the agreements bring about this restraint of trade or monopoly, or both, says appellant, is by excluding Stokes from exploiting its present and future patents for freeze-dried medical products and excluding Sharp & Dohme from exploiting its present and future patents for machinery and apparatus, except to make and use such machinery for its own purposes. It makes no difference, argues appellant, that the two parties were and are not in competition with each other, for notwithstanding the lack of present competition, there is a possibility that, apart from the agreements, either one might have decided to enter the other's field.

▉▉▉▉ It must be remembered that the patent laws give the patentee a monopoly. He may make, use or sell the patented product, license others, on an exclusive or non-exclusive basis, to do so, authorize the issuance of sublicenses, or assign the patent itself for a consideration. The sole limitation is, that he must not use his legitimate patent monopoly as a means of suppressing competition or acquiring a monopoly outside of the area of monopoly which the patent grants. The legality of the agreements in this case depends, therefore, upon a comparison of the competitive situation which they create with the patent monopolies which each party would have in

the absence of the agreements. Insofar as the parties agree to give Lyophile-Cryochem the exclusive power to issue licenses to outsiders, there is no extension of the patent monopoly because the licensing agent, unless it indulges in restrictive practices, not present here, is in no better bargaining position than its principals. As to the rights retained by or granted to the parties themselves under the agreements, the patents can be divided into two groups. First, there are the patents which each party owns within its own field, which each obviously would be just as free, but no more so, to exploit by making, using and selling in the absence of the agreements. It is true that Sharp & Dohme can make and use Stokes machines without royalty whereas others may not make the machines and must pay for their use, but that too is a privilege that Stokes would be free to grant within the scope of the normal patent monopoly. Thus, the objections to the agreements must be narrowed down to the cross-licensing rights granted under the second group of patents, consisting of those each party owns in the other's field. Stokes, interested in the manufacture of freeze-drying apparatus, conducts research for improvements in that apparatus. In the course of that research, it incidentally discovers improvements in freeze-drying processes and freeze-dried medical products. It is entitled to a patent monopoly on those improvements, but it cannot directly exploit those patents without going outside its normal field, which is machinery. Sharp & Dohme, on the other hand, is in a position to exploit the improvements. Moreover it is faced with the same problem, for it is in no position to exploit directly the improvements in machinery which it discovers in the course of its research. It is consistent with the spirit, as well as the letter, of the patent laws that each of these two companies should arrange to use the other in order to reap the rewards to which it is entitled as patentee and yet which it is in no position to reap by itself. Any patent owner who grants an exclusive license, reserving no right except to collect royalties, cuts himself off from practicing the art claimed in the patent until the patent has expired. As to objection that by including future patents in the pool appellees have gone beyond the normal patent-imposed restraint on trade in that they have contracted away their rights to enter into the field of the other for a period longer than the lives of the current patents, we find a similar situation in Transparent-Wrap Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563, where the licensee, in effect, contracted away his right to practice future improvements in the invention of the licensed patent without payment of a royalty.[6]

Appellant complains that the effect of the pooling agreements was to enable Stokes and Sharp & Dohme to dominate the field of freeze-drying. Again, this contention must be narrowed to the proposition that contributing to the pool the patents which each party owned or acquired in the other's field created an unlawful monopoly which would not have existed if each party had retained and exploited its own patents by itself. The testimony that all the patents, whether held by the parties in their own fields or not, "pretty well covered" the freeze drying industry, does not prove this proposition.

But conceding the patent pool did place in the hands of the parties a power to exclude competition from the industry by fixing prices or charging unreasonable royalties or other methods, that power by itself could not constitute unlawful monopolization unless accompanied by a purpose or intent to exclude competition. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; American Tobacco Co.

6. McCullough v. Kammerer Corp., 9 Cir., 166 F.2d 759, is not in point. The license agreement was held illegal there not because the licensee agreed to refrain from dealing with devices covered by any patents which either of the parties might own or be entitled to obtain, but because he agreed to refrain from the use of devices which were not patented at all or were patented by outside parties and which might come into competition with the patented devices. There is no agreement of that sort here.

v. United States, 328 U.S. 781, 809, 814, 66 S.Ct. 1125, 90 L.Ed. 1575. The District Court found no such intent. There is no evidence of any exclusionary activities or otherwise which might evidence such intent; and, indeed, the reasonableness of the agreements as a practical means of exploiting legitimate patent monopolies negatives such intent.

The judgments, insofar as they hold claims 5 and 6 of the Reichel patent valid, are reversed, and in all other respects are affirmed.