**UNITED STATES of America,**
**Plaintiff,**

v.

**BIRDSBORO STEEL FOUNDRY AND MACHINE COMPANY (a Pennsylvania corporation), also known as B.S.F. Company, Mesta Machine Company, and Birdsboro Steel Foundry and Machine Company (a Delaware corporation), Defendants.**

**Civ. A. No. 9659.**

United States District Court
W. D. Pennsylvania.
March 1, 1956.

Donald G. Balthis, Morton M. Fine, John R. Bronaugh, Anti-Trust Division, Dept. of Justice, Philadelphia, Pa., for plaintiff.

Joseph W. Swain, Jr., John S. Estey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., William G. Dickie, Jr., Dickie, McCamey, Chilcote, Reif & Robinson, Pittsburgh, Pa., for defendant Birdsboro Steel Foundry and Machine Company.

Walter J. Blenko, Edmund K. Trent, Walter J. Blenko, Jr., Blenko, Hoopes, Leonard & Buell, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant Mesta Machine Company.

JOHN L. MILLER, District Judge.

### Findings of Fact

#### A. *Parties and Subject Matter.*

1. This is a civil action brought by the United States of America, charging the defendants with violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, and seeking injunctive and other relief. Commerce in "cooling beds" and in certain auxiliary apparatuses ("runin" and "runout" tables used to move material to and from cooling beds), which are devices used in steel manufacture, is alleged to have been unlawfully restrained by the defendants.

2. Birdsboro Steel Foundry and Machine Company, a defendant herein, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and an inhabitant of the Western District of Pennsylvania. It has its principal office at Birdsboro, Pennsylvania, and during the period of time covered by the complaint had its principal office and manufacturing plant there.

On or about August 26, 1954, Birdsboro caused its name to be changed to B.S.F. Company.

3. Birdsboro, during the period of time covered by the complaint and until on or about December 15, 1954, was engaged in the manufacture and sale of steel and alloy steel castings, rolling mills and hydraulic and special machinery of various types, including cooling beds used in conjunction with rolling mills.

4. In 1954 substantially all the assets of Birdsboro, including patents and patent rights owned or controlled by it relating to cooling beds, and its subsisting contracts and agreements with Mesta relating to cooling beds were transferred to Birdsboro Steel Foundry and Machine Company, a defendant herein, a corporation organized and existing under the laws of Delaware.

5. Since at least on or about December 15, 1954, Birdsboro (Delaware) has carried on the business formerly engaged in by Birdsboro (Pennsylvania), including the manufacture and sale of cooling beds, and has assumed all rights and obligations under the aforesaid subsisting contracts, agreements, patents and patent rights of Birdsboro (Pennsylvania).

6. Mesta Machine Company (sometime hereinafter referred to as "Mesta"), a defendant herein, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and an inhabitant of the Western District of Pennsylvania. It has its principal office, place of business and manufacturing plant at West Homestead, Pennsylvania, and is found and transacts business within the Western District of Pennsylvania.

7. Mesta manufactures and sells various types of rolling mills and other machinery utilized in the steel industry, and sells, and during the period of time covered by the complaint sold cooling beds used in conjunction with rolling mills. It also manufactures and during the period of time covered by the com-

plaint manufactured cooling beds involving much larger parts than the type which are the subject of the Birdsboro-Mesta license agreements described hereinafter.

8. While both Birdsboro and Mesta are machinery builders, their facilities are of a different character in that Birdsboro is particularly well suited to manufacture equipment of small and intermediate sizes, and Mesta is especially capable of manufacturing equipment of very large sizes.

B. *The Manufacture of Rolled Steel Products.*

9. Steel is formed by casting, forging and rolling processes. In the making of rolled products, the molten metal is first poured into "ingot molds", where it solidifies. The resulting form, known as an ingot, is refined and shaped by successive rolling operations into various forms of semifinished or finished steel products. The first of such rolling operations is performed on either of two types of mills, known as "blooming mills" and "slabbing mills", whence the ingots emerge in reduced forms known as blooms and slabs, respectively. The blooms are subsequently rolled on "bar mills" or "billet mills" into "bars" or "billets", which are in turn rolled on "skelp mills", "seamless tube mills", "rod mills", "structural mills", "rail mills", or "merchant mills". The respective products of these latter mills are skelp (which is further rolled on tube mills), seamless tubing, rods (which may be cold-drawn into wire), structural shapes, rails and merchant bar products. Slabs are rolled on "plate mills" into plate or on "hot strip mills" into what is termed hot rolled strip. Hot rolled strip may be further processed on "cold strip mills" into a product described as cold rolled strip.

Products which are intended subsequently to be hot rolled are called "semifinished products". Products which are not intended subsequently to be hot rolled are called "finished products". Certain of the above mills are used to roll semifinished products, and certain of them are used to roll finished products.

C. *Cooling Beds.*

10. Except as otherwise indicated by the word "cold", all of the rolling operations recited in Finding 9 are carried on while the steel is hot and plastic. The several rolling operations are not necessarily carried on in immediate succession, or even in the same steel plant. It is frequently necessary to permit semifinished products to cool at various stages in their manufacture, for convenience in storage or handling, prior to their being reheated for further hot rolling. It is also necessary to permit finished products to cool, so that they may be conveniently stored or handled in subsequent cold-working processes. The term "cooling bed" is not a term of art. A "cooling bed" is a place where steel is set to cool. There are many types of cooling beds.

11. Hot steel products may be conveyed to a cooling bed in a variety of ways, one of which is by means of a conveyor table called a "run-in table" equipped with motor-driven rollers.

12. The cooled steel products may be removed from the cooling bed in a variety of ways, one of which is by means of a conveyor table, called a "run-out table", equipped with motor-driven rollers.

13. Neither the run-in table nor any other device for conveying the hot steel products to the cooling bed, nor the run-out table or any other device for removing the cooled steel products from the cooling bed, are parts of the cooling bed itself, as that term is used in the steel industry and as it is used herein. However, such auxiliary devices are part of the subject matter of the conspiracy alleged in the complaint.

14. A few types of steel rolled on merchant mills, when intended for a few end uses, *e.g.*, flat bars ("spring flats") destined to be made into leaf springs, must be cooled slowly subsequent to the final rolling operation. Such slow cooling can be accomplished in various ways, one of which is to place the pieces to be cooled close together in a pack so as to

reduce the effective radiating surface and restrict the amount of air which can circulate around the individual pieces. This process is known as "pack annealing". Some cooling beds for finished products contain devices for pack annealing. Cooling beds for semi-finished products only do not contain devices for pack annealing.

15. The principal component parts of cooling beds are: (a) the packing mechanism (on some finished product beds), for continuous pack annealing of pieces desired to be slowly cooled, and which can be used for transfer purposes, without pack annealing, when pack annealing is not required; (b) the work-supporting bars, upon which the pieces to be cooled rest while they are cooling; and (c) the under-structure, which is a mechanism to actuate the work-supporting bars so as to cause the pieces being cooled to move across such work-supporting bars during the time of cooling.

D. *History of Cooling Bed Manufacture.*

16. The provision of cooling facilities for hot steel is necessarily as old as the hot rolling of steel, and cooling facilities have been a part of every installation for hot rolling.

17. Many United States patents have issued, commencing as early as 1872, disclosing various cooling beds and environmental equipment.

18. Over the past fifty years many machinery builders other than Birdsboro and Mesta have made cooling beds for steel manufacturing companies, and some steel manufacturing companies have made cooling beds for their own use.

E. *The Cooling Bed Inventions of Fisk and Peterson.*

19. For some time prior to 1927 Gustaf L. Fisk was chief engineer of Pittsburgh Crucible Steel Company, at its plant at Midland, Pennsylvania. From 1927 to 1931, Fisk was chief engineer of Mesta. He was a specialist in the field of merchant mills, and was particularly expert in the field of cooling beds, especially in pack annealing beds for merchant mills.

20. From about 1925 to the present time, Edward T. Peterson has been chief engineer of Birdsboro. He is an outstanding engineer in the cooling bed field.

21. Fisk made inventions disclosed and claimed in the following patents, each of which issued to Mesta as Fisk's assignee:

| Patent Number | Issue Date |
|---|---|
| (a) 1,761,470 | June 3, 1930 |
| (b) 1,904,434 | April 18, 1933 |
| (c) 1,921,353 | August 8, 1933 |
| (d) 1,964,147 | June 26, 1934 |
| (e) 2,328,634 | September 7, 1943 |
| (f) 2,328,635 | September 7, 1943 |

The aforesaid patents all disclose cooling beds (and certain environmental equipment also) and claim various improvements in cooling beds. The general nature of the several improvements is as follows:

(a) Patent 1,761,470 discloses a cooling bed structure capable of straightening and cooling all types of bars (but notably pieces which will not stand on edge without lateral support, such as spring flats) and pack annealing them if pack annealing is desired. The pack-annealing mechanism acts first to place a bar on edge against a retreating support and then to place successive bars in face-to-face contact to form a pack of bars standing on edge. The support functions until the pack has been built up to predetermined size, after which the addition of each hot bar to the rearward side of the pack causes the discharge of an annealed bar from the forward side of the pack. The annealed work pieces are then further cooled, singly, on a secondary section (work-supporting bars). If pack annealing is not necessary, the work pieces may be moved singly over the packing section to the work-supporting bars.

(b) Patent 1,904,434 discloses a pack-annealing mechanism in which, instead of there being a retreating support for supporting the forward side of the pack, a bar is laid flat and other bars are piled

flatwise upon it, after which bars are placed on edge in pack formation, the initial pile providing lateral support until the pack has been built up to size, whereupon the first-piled bars are transferred to a secondary section (work-supporting bars).

(c) Patent 1,921,353 discloses a pack-forming mechanism employing alternately-operating plungers which successively advance each hot bar to the pack. Straighter bars and a closer pack are obtained.

(d) Patent 1,964,147 discloses work-supporting bars which may be adjusted to provide either smooth (plane) work-supporting surfaces or notched work-supporting surfaces as may be desired. This makes the cooling bed more versatile, since some work is best cooled while supported on plane surfaces and other work is best cooled while supported in notches. The broad claims of this patent dominate the V-shaped form of work-supporting bars claimed in Peterson patent Re. 18,996, referred to in Finding 22.

(e) Patent 2,328,634 discloses a retreating abutment for supporting flat bars on edge, but leaning forwardly, during pack formation. Unlike the retreating support of patent 1,761,470 (par. (a), supra), it is arranged on arms which overhang the pack and which extend downwardly therefrom to engage the pack. The arrangement permits the packing of wider sections, and, because the retreating abutment supports the bar at the front of the pack at all times, rather than merely during the formation of the pack, a more straight and even discharge of the bars is obtained.

(f) Patent 2,328,635 discloses overhead latch supports for engaging the upper edge of the rearmost bar of the pack. It is particularly useful in the packing of wide, thin, flat sections.

22. Peterson made inventions disclosed and claimed in the following patents, each of which issued to Birdsboro as Peterson's assignee:

| Patent Number | Issue Date |
| --- | --- |
| (a) 1,834,728, | December 1, 1931 |
| reissued as | |
| Re. 18,996 | November 14, 1933 |
| (b) 2,684,605 | July 27, 1954 |

The aforesaid patents disclose cooling beds (and certain environmental equipment also) and claim various improvements in cooling beds. The general nature of the improvements is as follows:

(a) Patent No. Re. 18,996 discloses convertible work-supporting bars which are V-shaped in cross-section, one leg of each bar having a plane work-supporting surface and the other leg having a notched work-supporting surface, with a mechanism designed so that either the plane surface or the notched surface may be presented to the work. This change-over mechanism provides for the simultaneous shifting of all the work-supporting bars from one position to the other. The structure is dominated by the broad claims of Fisk patent 1,-964,147 (Finding 21(d) ), but Peterson's invention is a valuable improvement in that, among other things, it is simpler and stronger and insures a straighter product.

Patent Re. 18,996 also discloses a highly desirable under-structure mechanism for actuating the work-supporting bars, in that the work load is balanced so that the power requirement is reduced and misalignment of the bed due to heat expansion is avoided.

(b) Patent 2,684,605 discloses an improved understructure which is simpler and less expensive, and requires lesser pit depth, than the understructures of earlier cooling beds.

23. Fisk and Peterson made joint inventions disclosed and claimed in the following patents:

| Patent Number | Issue Date |
| --- | --- |
| 1,954,123 | April 10, 1934 |
| 2,332,905 | October 26, 1943 |

Patent 1,954,123 issued to Mesta as the assignee of Fisk and Peterson. It

discloses a rotatable transfer mechanism between the run-in conveyor and the work-supporting bars having transfer arms of different character and selectively usable at the will of the operator, the arms delivering the successive workpieces to grate bars whose inclination may be adjusted, and thence to work-supporting bars. One set of arms is used for spaced cooling, with the grate bars inclined; the other set is used for pack annealing, with the grate bars level and in that position constituting a packing section. Improved results are obtained in each type of cooling, as compared with the operation of prior cooling beds.

24. Patent 2,332,905 issued to Mesta as the assignee of Fisk and to Birdsboro as the assignee of Peterson. It discloses a further improvement in the pack-forming and supporting portion of a cooling bed, consisting in overhead abutments which move not only outwardly but also upwardly as the pack is built up to size, and latches engaging the pack at the rear, so that bars cannot fall either forwardly or rearwardly. The stability of the pack is improved, and the bars separate clearly from the pack.

25. Peterson and his son, Edward C. Peterson, made a joint invention disclosed and claimed in patent 2,328,923, which issued to Birdsboro as the assignee of the Petersons on September 7, 1943. Patent 2,328,923 provides another improvement in pack-annealing beds, wherein the bars of the pack are placed on edge but sloping upwardly and rearwardly, and are supported through overhead engagement of the rearmost bar at its upper edge.

F. *Validity of the Fisk and Peterson Patents.*

26. No evidence has been introduced to rebut the presumption of validity of the patents here involved, and plaintiff has not disputed their validity.

G. *Advantages of Cooling Beds Embodying Fisk and Peterson Inventions.*

27. A cooling bed covered by the Fisk and Peterson patents (herein called a "Fisk-Peterson bed") is a highly versatile bed which is particularly well adapted to cool the variety of products produced by a merchant mill. It can be easily adjusted either to pack anneal or not to pack anneal, as required. The alternately available V-shaped notched and smooth-surfaced work-supporting bars permit the cooling of various shapes of product and enable them to be kept straight while being cooled. The understructure mechanism is economic to operate and permits the product to be carried across the bed at such speeds as the operator may select. The Fisk-Peterson bed thus provided a facility that was very useful to steel-makers, especially to the smaller steel plants which because of a limited demand for a single type of product might wish to roll different products at different times on the same mill.

H. *The Situation as between Birdsboro and Mesta Respecting Cooling Beds.*

(1) *Patents*

28. Neither Birdsboro nor Mesta could, independently of the other, make cooling beds containing the advantageous features desired by the trade (Finding 27) without trespassing on patent rights owned by the other, because such cooling beds embodied inventions some of which were covered by patents owned by Birdsboro and some of which were covered by patents owned by Mesta.

In addition, neither Birdsboro nor Mesta individually could build beds embodying certain inventions because patents owned by one of them covering such inventions blocked patents owned by the other:

(a) Neither Birdsboro nor Mesta could build a bed containing the V-shaped alternately-available notched and smooth-faced work-supporting bars: Mesta could not build such a bed because Birdsboro owned the Peterson reissue patent No. Re. 18,996, covering the specific V-bar structure; Birdsboro could not build such a bed because the V-bars were dominated by the broad claims of

Fisk patent No. 1,964,147, owned by Mesta.

(b) Neither Birdsboro nor Mesta could build a bed containing the overhead packing device disclosed and claimed in Peterson and Peterson patent No. 2,328,923: Mesta could not build such a bed because Birdsboro owned patent No. 2,328,923; and Birdsboro could not build such a bed because such a device was dominated by the broad claims of Fisk patents, owned by Mesta, especially Fisk patent No. 1,-761,470.

(c) Birdsboro could not build a bed containing the overhead packing device disclosed and claimed in Fisk and Peterson patent No. 2,332,905, owned by Birdsboro and Mesta jointly, because such device was dominated by the broad claims of Fisk patents, owned by Mesta, especially Fisk patent No. 1,761,470.

(2) *Facilities*

29. Fisk-Peterson beds contain thousands of small parts, each weighing from one-half pound to a few hundred pounds. Such a bed may contain between 40,000 and 50,000 parts and weigh 900,000 pounds. The parts must be specially cast and machined. They are not interchangeable, and must be assembled at the manufacturer's plant and fitted and numbered so that when the bed is reassembled at the purchaser's site each part may be relocated in the identical place in the assembly.

30. Since at least 1930, Birdsboro's facilities have been particularly well suited to the construction of Fisk-Peterson beds. It has one foundry devoted entirely to castings ranging from one-half pound to 600 pounds in weight, a wealth of small machine tools, an extensive assembly floor, and an engineering staff which is especially competent in the cooling bed field.

31. Since at least 1930, Mesta's facilities have not been suited to the construction of Fisk-Peterson beds. Mesta's foundry equipment is large and is adapted to the production of only large castings. Mesta cannot economically make small castings and (except in extreme emergencies) purchases from others all iron castings under 500 pounds and all steel castings under 1,000 pounds. Mesta's machine tools are extraordinarily large. Its shop is crowded, and it does not have floor space for assembling a Fisk-Peterson bed.

32. Although Mesta does not and has not manufactured cooling beds embodying features of the claims of the licensed patents, both Birdsboro and Mesta manufacture and sell, and during the period of time covered by the complaint, have manufactured and sold cooling beds for both finished and semifinished products not embodying the licensed patents.

33. Mesta, to engage in the manufacture of Fisk-Peterson beds, would be required to purchase more land, to build a new foundry, to put in new, small machine tools, and to acquire additional engineering personnel.

34. Since at least 1930, Mesta has been interested in supplying complete merchant mills. These mills involve large parts which are compatible with Mesta's facilities, but in many cases it is difficult for Mesta to obtain the order for the entire mill installation without also taking the order for some of the components containing small parts, notably the cooling bed, which Mesta could not make itself.

*I. Summary of Agreements between Birdsboro and Mesta.*

35. Defendants have made four agreements relating to cooling beds:

(a) Agreement of July 7, 1930.

(b) Supplemental agreement of February 24, 1933.

(c) Agreement of February 24, 1933.

(d) Agreement of August 12, 1942.

Each of the first three agreements—(a), (b), and (c), above—was cancelled and terminated more than thirteen years ago, by an express provision in the agreement of August 12, 1942. That agreement still subsists, Birdsboro (Delaware) having assumed all rights and obligations of Birdsboro thereunder.

(a) The agreement of July 7, 1930, involved Fisk patent No. 1,761,470, which issued to Mesta on June 3, 1930, and Peterson application Serial No. 389,-119, filed August 29, 1929, assigned to Birdsboro, which later eventuated in patent No. 1,834,728 (subsequently reissued as Re. 18,996). The Fisk patent related to the packing mechanism in general, and the Peterson application to the understructure and the work-supporting bars. A cooling bed embodying the several inventions of Fisk and Peterson could not lawfully be made or sold by either Birdsboro or Mesta without a license from the other. The agreement, which is limited to merchant mill cooling beds covered by the Fisk patent or the Peterson application, or by both, conferred on Mesta an exclusive license under the Birdsboro application to sell, and on Birdsboro an exclusive license under the Mesta patent to make.

(b) The supplemental agreement of February 24, 1933, came about after the issuance of patent No. 1,834,728. When that patent issued, it became apparent that Peterson had claimed certain subject matter (claims 9–14 of the patent) disclosed in Fisk's co-pending application Serial No. 426,876 (subsequently patent 1,921,353). These claims related generally to the alternating plunger scheme and related mechanism mentioned in Finding 21(c). An interference, No. 65,389, was declared by the Patent Office. It was determined that Fisk was the prior inventor of the subject matter of these claims, and the interference was settled accordingly. The supplemental agreement—agreement (b), above—provided that the subject matter of claims 9–14 should go to Fisk and that the Fisk application should come under the terms of agreement (a), above. Agreement (b) also took claims 23–25 of patent No. 1,834,728 out of the operation of agreement (a) and made them the subject of agreement (c), above. All the other claims of patent No. 1,834,728 remained within the operation of agreement (a).

(c) The agreement of February 24, 1933, agreement (c) above, dealt primarily with the inventorship of the broad idea of having a smooth and a notched surface on the bed and of making one or the other of these selectively available. This broad subject matter was covered by claims 23–25 of Peterson patent No. 1,834,728. In Fisk's pending application Serial No. 529,076 (subsequently issued as patent No. 1,964,147), Fisk claimed the same broad idea. An interference (No. 65,090) was declared by the Patent Office between those broad claims of the Peterson patent, owned by Birdsboro, and the Fisk application, owned by Mesta. The agreement provided that it should be determined which of Fisk or Peterson was the inventor of the subject matter of those claims. As to merchant mill cooling beds the agreement provided for licensing along the same general lines as agreement (a). In addition, as to cooling beds for installations other than merchant mills, Birdsboro was given an exclusive license to make, use and sell under the broad subject-matter claims.

It was determined that Fisk was the inventor as to the disputed subject matter, and the interference was settled accordingly. Peterson patent No. 1,834,-728 was reissued as patent Re. 18,996 with the broad subject-matter claims 23–25 removed. They appear as claims 15–17 of Fisk patent No. 1,964,147.

There remained in the Peterson patent, as reissued, claims to the V-shaped form of work-supporting bars. These claims were dominated by the broad claims awarded to Fisk, with the result that the V-bars could not be constructed without rights under the Peterson reissue patent, owned by Birdsboro, and the Fisk patent No. 1,964,147, owned by Mesta. The claims to the understructure also remained in patent Re. 18,996.

36. In addition to the two interferences referred to in Finding 35, a later interference (No. 80,348) was declared by the Patent Office between Peterson and Peterson Application Serial No.

409,260 (later issued as patent No. 2,-328,923) and Fisk Application Serial No. 412,802 (later issued as patent No. 2,328,635). In this third interference priority of invention was awarded to Peterson and Peterson.

*J. The Agreement of August 12, 1942.*

37. On August 12, 1942, Mesta and Birdsboro entered into an agreement which provided:

"Whereas:

"A. Mesta and Birdsboro have heretofore entered into agreements as follows:

"(i) Agreement dated the seventh day of July 1930;

"(ii) Supplemental Agreement executed by Birdsboro on February 15, 1933 and by Mesta on February 24, 1933;

"(iii) Agreement executed by Birdsboro on February 15, 1933 and by Mesta on February 24, 1933;

all providing for rights and duties of the parties thereto in the exploitation of certain inventions of Fisk and Peterson for Cooling Beds, under Fisk patent 1,-761,470; Fisk patent 1,921,353 (identified in certain of said agreements as Application Ser. No. 426,876); Fisk patent 1,964,147 (identified in certain of said agreements as Application Ser. No. 529,076); and Peterson Reissue Patent 18,996 (originally patent 1,834,728, and identified in certain of said agreements as Application Ser. No. 389,119).

"B. Mesta is the owner, by assignment, of Fisk Patent 1,904,434 and Fisk & Peterson Patent 1,954,123.

"C. Peterson, jointly with Edward C. Peterson, has invented certain improvements relating to Cooling Beds, for which they have filed application for United States Letters Patent, Serial No. 409,260.

"D. Fisk has invented certain improvements relating to Cooling Beds, for which he has filed applications for United States Letters Patent, Serial No. 412,801 and Serial No. 412,802.

"E. Peterson and Fisk have jointly invented certain improvements relating to Cooling Beds, for which they have filed application for United States Letters Patent, Serial No. 437,794.

"F. The parties wish to establish a basis for the exploitation of Cooling Beds involving any or all of the several inventions referred to in Sections A, B, C, D and E above. Said inventions, together with any inventions subsequently included in this agreement, are hereinafter collectively termed the 'licensed inventions'.

\* \* \* \* \*

"1. The several agreements identified in Section A hereof are all hereby terminated. All rights and obligations of the parties thereunder are surrendered and discharged. A certain Cooling Bed now on order with Mesta for Youngstown Sheet & Tube Company, and embodying certain of the licensed inventions, shall be subject to all the terms and conditions of this agreement, as though the order therefor had been entered after the date hereof.

"2. For the purposes of this agreement the term 'Cooling Beds for Merchant Mills' means cooling beds designed and intended for use for the cooling of finished hot rolled products and embodying one or more of the licensed inventions. The term 'Cooling Beds for Semi-finished Products' means cooling beds designed and intended for use for the cooling only of products intended to be subsequently hot-rolled and embodying one or more of the licensed inventions. Cooling beds which are not patented or the subject of a pending application for patent are not within the purview of this agreement.

"3. Birdsboro shall have the exclusive right to make, use and sell 'Cooling Beds for Semi-finished Products', and Mesta shall have the exclusive right to sell 'Cooling Beds for Merchant Mills'.

"As between the parties hereto each shall have the exclusive right of bidding on Cooling Beds coming within its exclu-

sive field and the other shall not submit any bid thereon in competition therewith; *Provided,* however, that either party may, at its option, grant to the other the right to quote direct to a prospective customer on a cooling bed coming within its exclusive field.

"4. Birdsboro shall have the exclusive right, subject to the provisions hereinafter stated, to build 'Cooling Beds for Merchant Mills', and subject to the provisions herein stated Mesta shall buy from Birdsboro and Birdsboro shall build for Mesta the Cooling Beds to be sold by Mesta hereunder.

"Should Mesta obtain a contract for any Cooling Bed for Merchant Mills, it shall offer to Birdsboro the right to build the same. Mesta shall not build such cooling bed itself or procure the same from others without first obtaining the consent in writing of Birdsboro, except as provided in Article 5 hereof.

"5. The prices at which Birdsboro shall sell cooling beds to Mesta shall be fair and reasonable, and comparable in general to prices paid by Mesta to Birdsboro for cooling beds already bought, with due allowance made for general increases or decreases in the cost of labor and materials, taxes, etc. In any event, the prices charged by Birdsboro shall be such as to enable Mesta to sell in competition with equipment offered by others, and to allow Mesta a reasonable profit for such resale in competition; *Provided,* however, that Birdsboro shall not be required to manufacture cooling beds at competitive prices which shall result in a loss to itself. Should Birdsboro be unwilling to accept the order from Mesta for a cooling bed on that account, then Mesta shall have the right, notwithstanding anything herein stated to the contrary, to build such cooling bed itself or to have it built by others.

"Mesta shall use its best efforts to obtain such prices as to enable Birdsboro to make fair profits on the cooling beds herein contemplated. Mesta shall in no case quote prices for cooling beds without first having obtained prices from Birdsboro, unless such quotation is made based upon standard prices then in force between Mesta and Birdsboro.

"Should Birdsboro not be in position to undertake delivery of a cooling bed to meet the demands of a customer, then Mesta shall have the right, notwithstanding anything herein stated to the contrary, to build such cooling bed itself or cause the same to be built by others.

\* \* \* \* \*

"8. Contemporaneously herewith, Fisk has executed an assignment to Mesta of his said applications, Serial Nos. 412,801 and 412,802; Peterson, jointly with Edward C. Peterson, has assigned to Birdsboro said application, Serial No. 409,260; and Fisk and Peterson have executed assignments to Mesta and Birdsboro respectively of their several undivided interests in said application, Serial No. 437,794. Contemporaneously herewith, Mesta has entered into an agreement with Fisk, and Birdsboro has entered into an agreement with Peterson, copies of which said agreements are hereto attached and made a part of this agreement.

"So long as this agreement shall remain in force, the royalties due Fisk on any cooling bed sold by Mesta shall be paid by Mesta. In case said bed is made by Birdsboro for Mesta, any royalties due Peterson thereon shall be paid by Birdsboro; but if the bed shall have been made by someone other than Birdsboro pursuant to the provisions of Section 5 of this agreement, Mesta shall pay whatever royalties are due Peterson.

"So long as the agreement shall remain in force, the royalties due Peterson and Fisk on any cooling bed made by Birdsboro and sold by Birdsboro to anyone other than Mesta shall be paid by Birdsboro.

"9. Each party shall have the right but not the obligation to seek patent protection on any inventions or improvements made by or for it, or otherwise acquired by it, relating to Cooling Beds, and any patent or application covering the same shall be automatically included

in the licensed inventions of this agreement.

"Each party shall promptly advise the other of the existence of any such invention or improvement and in the event the notifying party elects not to seek patent protection thereon, it shall so signify. The party notified may then, if it so chooses, seek patent protection thereon and an assignment to itself of the subject-matter, and the notifying party shall give all proper aid in procuring the execution of the necessary documents. Any application or patent so filed or obtained shall be included in the licensed inventions of this agreement.

"Each party shall pay all fees and expenses attendant upon the filing, prosecution and acquisition of any applications or patents which it obtains.

"In the case of inventions made jointly by an employee or representative of Mesta and an employee or representative of Birdsboro, each party shall procure an assignment of the undivided interest of its said employee or representative and each party shall bear half of the expenses of preparation and prosecution of any applications or patents covering such joint inventions, and any such joint applications, or patents granted thereon, shall be included in the licensed inventions of this agreement.

"Neither party is obliged to continue the prosecution of any patent application which it has caused to be filed, but it shall not voluntarily permit or bring about the forfeiture or abandonment thereof without notifying the other party in good time of its intention so to do, and the party notified may, if it so chooses, take over the further prosecution of the application at its own expense. Any application so taken over shall become the property of the party continuing its prosecution and the other party shall procure the execution of all documents necessary to this end, but the subject-matter shall remain one of the licensed inventions of this agreement.

"10. This agreement may be cancelled by either party upon giving the other party three (3) years' notice of its intention to do so, but no such notice shall be given within two (2) years of the date hereof, it being the intent of the parties that the option of cancellation shall not be exercised so as to become effective within five (5) years of the date hereof. In the event of such cancellation, all cooling beds on order at the effective date of the cancellation shall be subject to the provisions of this agreement. Unless sooner cancelled, it shall continue until the expiration of the last patent to expire which is included specifically herein, or which issues on any application recited herein, or which is added hereto by supplemental agreement.

"For purposes of this agreement, any claim which shall be held invalid or limited by a court from whose decision no appeal or other proceeding for review is or can be taken, shall be considered as if it had expired or as limited by said decision as of the date of the final decree or affirmance of the holding of the court.

"In case of termination of this agreement, each party shall continue to enjoy a non-exclusive license under any applications and any patents granted thereon and/or patents of the other covering any of the 'licensed inventions', subject, however, to the obligation of Birdsboro to reimburse Mesta for any royalties which Mesta may be required to pay on account of the exercise of said license by Birdsboro, and to the obligation of Mesta to reimburse Birdsboro for any royalties which Birdsboro may be required to pay on account of the exercise of said license by Mesta.

"11. The benefits and obligations hereof shall inure to and be binding on the parties and their successors in business. The rights granted hereby are not assignable either in whole or in part (except to the successors in business of the parties), either by the act of the parties or by operation of law, and in the event of bankruptcy, either voluntary or involuntary, shall cease and determine as of the date of such bankruptcy."

38. Contemporaneously with the execution by Birdsboro and Mesta of the agreement of August 12, 1942, and as provided in paragraph 8 thereof, Mesta entered into an agreement with its former Chief Engineer, Fisk, and Birdsboro entered into an agreement with its Chief Engineer, Peterson, which provided for the assignment of the entire right, title and interest in and to patent applications developed either solely or jointly by the parties' engineers which related to cooling beds to Mesta and Birdsboro, respectively. Fisk covenanted in his agreement with Mesta that if he made any improvements in inventions covered by patent applications enumerated in that agreement, he would promptly disclose them to Mesta and Mesta would have the right to file applications for patents thereon, and to respective assignments thereon. Peterson covenanted in his agreement with Birdsboro that he would disclose fully to Birdsboro all inventions he then had or might make, or over which he had any control, relating to cooling beds for rolling mills, and would assign his entire interest in such inventions to Birdsboro.

39. Auxiliary apparatuses such as unpatented run-in tables or run-out tables not constituting parts of a patented cooling bed combination are not within the purview of the agreement of August 12, 1942.

40. Patents and applications relating to run-in or run-out tables were owned by Birdsboro or Mesta at the time the agreement of August 12, 1942 was made, or were subsequently acquired, but none of those patents or applications was incorporated in the agreement, either originally or under the provision for inclusion of improvement patents. Those patents and applications are:

| Inventor | Patent Number | Date | Assignee |
|---|---|---|---|
| Fisk | 1,937,194 | Application filed Oct. 3, 1930<br>Issued Nov. 28, 1933 | Mesta |
| Peterson | 2,364,386 | Application filed July 7, 1942<br>Issued Dec. 5, 1944 | Birdsboro |
| Peterson | 2,498,448 | Application filed Feb. 14, 1947<br>Issued Feb. 21, 1950 | Birdsboro |
| Peterson | 2,498,449 | Application filed Nov. 26, 1947<br>Issued Feb. 21, 1950 | Birdsboro |

41. Birdsboro never required Mesta to purchase such tables (or any other environmental equipment) from Birdsboro in connection with the purchase of a cooling bed. Neither Birdsboro nor Mesta ever required any steel manufacturer to purchase such tables (or any other environmental equipment) in connection with the purchase of cooling beds. In some cases purchasers ordered environ-

mental equipment such as run-in and/or run-out tables as well as the bed; in other cases they did not.

42. The evidence discloses no subsisting agreement between the parties with respect to the manufacture, sale, or use of cooling beds or auxiliary devices beyond the territorial limits of the United States.

### K. Business done by Birdsboro and Mesta in Cooling Beds.

43. Birdsboro and Mesta have sold cooling beds in interstate commerce.

#### (1) Patented Cooling Beds

44. During the period from July 7, 1930 to June 19, 1951, Birdsboro manufactured twelve patented cooling beds. Two of these beds were for semifinished products (as to which Birdsboro had full and complete rights to make, use, and sell). The remaining ten beds were patented beds for finished products. Four of these beds were sold direct to the customer and not to Mesta for resale. The remaining six patented cooling beds were sold to Mesta for resale.

With one exception, all of the twelve patented cooling beds, which were manufactured and sold by Birdsboro, were covered by numerous claims of both Mesta and Birdsboro patents. The exception was a semifinished-product bed manufactured and sold by Birdsboro direct to the customer. This bed was covered by a Birdsboro patent.

45. From January 1, 1930 up to the date of the filing of the complaint, Birdsboro has never without Mesta's permission sold Fisk-Peterson beds for finished products, except as stated in Finding 48.

46. The extent of coverage of the twelve patented cooling beds manufactured by Birdsboro was such that if the patented subject matter were removed the remainder would not constitute a cooling bed or any recognizable portion thereof.

47. From July 7, 1930 to June 20, 1951, Birdsboro and Mesta applied the agreements solely to cooling beds embodying subject matter covered by the Fisk and Peterson patents.

48. Two of the ten patented finished product cooling beds mentioned in Finding 44 were sold by Birdsboro direct to the customer for ultimate use outside the United States. Both were manufactured in the United States within the territorial domain of the licensed patents. One was sold in the United States with the permission of Mesta. The other was sold without communicating with Mesta.

#### (2) Unpatented Cooling Beds

49. During the period from July 7, 1930 to June 19, 1951, both Birdsboro and Mesta, independently of any agreement between them, did business in cooling beds of the type described in the complaint and not covered by Fisk and Peterson patents. Birdsboro made and sold three such unpatented beds, one for finished products and two for semifinished products. The finished-product bed embodied inventions disclosed in two expired Fisk patents and one expired Peterson patent. None of those beds were sold to Mesta. Mesta sold twenty such unpatented beds, seventeen for finished products and three for semifinished products. Mesta made seventeen of those beds itself (fifteen for finished products and two for semifinished products), had two (for finished products) made for it by Morgan Construction Company, and had one (for semifinished products) made for it by Bethlehem Steel Company; none of them was made by Birdsboro.

50. During the period from July 7, 1930, to June 19, 1951, Mesta and Birdsboro sold a total of twenty-three unpatented cooling beds, whereas only twelve beds embodying Fisk and Peterson patents were sold in the same period.

51. The evidence reveals only one infringement of any of the Fisk and Peterson patents during the period July 7, 1930, to June 19, 1951: namely, in the manufacture of a cooling bed by Treadwell Engineering Company of Easton, Pennsylvania, and sale of the bed by

Treadwell to Wisconsin Steel Works of International Harvester Company in 1936–7. A suit for infringement was brought against Treadwell on account of such manufacture and sale and was concluded by Treadwell's taking a consent decree and paying agreed damages, the vendee being licensed without further charge. Except for the request for a license made by Treadwell to Mesta after the above suit for the second infringement by Treadwell had been filed, there is no evidence that any request for a license to manufacture or sell cooling beds was made by any one either to Birdsboro or to Mesta.

L. *Subsisting Cooling Bed Patents Owned by Others than the Defendants.*

52. At least one hundred and twenty United States patents disclosing cooling beds had been issued to others than the defendants prior to the commencement of this action. Twenty-two of them relate to pack-annealing beds. The earliest cooling bed patent that appears is patent No. 124,867, dated March 19, 1872. The earliest patent showing pack annealing issued to Morgan Construction Company (one of the principal manufacturers of merchant mills and cooling beds therefor), it being patent No. 600,335, dated March 8, 1898.

At the date this action was commenced, ninety-six of the aforesaid patents were expired and their subject matter was in the public domain. Included in the twenty-four patents remaining in force are patents to cooling bed manufacturers, Treadwell Engineering Company, Morgan Construction Company, and United Engineering & Foundry Company, and to steel makers United States Steel Corporation and Bethlehem Steel Company.

M. *Business done by Other Manufacturers in Cooling Beds.*

53. Machinery builders other than Birdsboro and Mesta who have made cooling beds for steel manufacturing companies since 1930 include eight such builders who reported their sales to plaintiff for use in this case and six additional builders from whom United States Steel Corporation has purchased beds.

54. During the period from July 7, 1930 to June 19, 1951, more than 100 cooling beds were manufactured in the United States.

55. During the period from July 7, 1930 to June 19, 1951, Morgan Construction Company and United Engineering & Foundry Company each sold a number of cooling beds in excess of the number of both patented and unpatented beds sold by Birdsboro and Mesta combined.

56. United States Steel Corporation is the largest steel manufacturer in the United States. Next in rank are Bethlehem Steel Company, Republic Steel Corporation, Jones & Laughlin Steel Corporation, National Steel Corporation and The Youngstown Sheet & Tube Company. United States Steel has in operation in its plants 137 cooling beds of the type described in the complaint. One of them is covered by Fisk and Peterson patents and was sold by Birdsboro to Columbia Steel Company prior to its acquisition by United States Steel Corporation. Bethlehem has three of such patented beds. National has three of such patented beds, constituting parts of an entire steel plant built for it by Mesta. Youngstown has one such patented bed. Neither Republic nor Jones & Laughlin has any of such patented beds.

N. *The Competitive Situation in the Cooling Bed Industry.*

57. Neither Birdsboro nor Mesta has fixed, or attempted to fix, the price at which the other should sell cooling beds or other equipment, patented or unpatented.

58. Neither Birdsboro nor Mesta has compelled, or attempted to compel, any one to purchase either patented or unpatented equipment in connection with the sale and purchase of patented cooling beds.

59. Neither Birdsboro nor Mesta has excluded any concern from doing business in cooling beds, except as stated in Finding 51.

60. Birdsboro and Mesta are not competitors or potential competitors with each other with respect to cooling beds of the type covered by the Fisk-Peterson patents.

61. Neither Birdsboro nor Mesta, nor Birdsboro and Mesta combined, are dominant factors in the cooling bed industry.

62. Birdsboro and Mesta did not attempt to, and did not, regiment the cooling bed industry through the agreements or otherwise.

63. The effect of the agreements between Birdsboro and Mesta was to increase competition in cooling beds.

## Discussion

■ This is a civil action under § 4 of the Sherman Act, 15 U.S.C.A. § 4, alleging violation of § 1 of the act, 15 U.S. C.A. § 1. Injunctive relief, looking to the future, is sought. Therefore, the disposition of the case must ultimately turn upon consideration of the 1942 agreement between defendants and their activities pursuant thereto, that agreement being the only agreement which has existed between defendants, relating to the subject matter of this action, since 1942. See Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 163, 182, 51 S.Ct. 421, 75 L.Ed. 926.

As more specifically set forth in the findings, defendants' patents which are here involved were both blocking and complementary. Defendants could, of course, refrain from making any agreement concerning such patents, in which event cooling beds embodying the best features of both defendants' patents could not lawfully be made, used, or sold, competitively or otherwise. Thus, in the absence of an agreement linking the right to use both defendants' patents, neither the public nor defendants could obtain any benefit from the inventions or from the lawful monopoly of the patents during the life of the patents. Therefore, it would seem that some agreement whereby the patent rights may be combined is desirable from the viewpoint of the public interest.

Defendants could, of course, dedicate their patents to the public use, or grant free or cheap licenses to all applicants (of which, with one exception, there have been none), or agree to compete with each other in the production of the patented beds (although Mesta could not feasibly perform such an agreement), or otherwise disclaim the lawful monopoly powers conferred by the patent laws. It may be assumed that it would be of public benefit if defendants, as well as all patentees, would go on inventing and disclosing their inventions without claiming the rewards inherent in the monopoly powers conferred by the patent laws. But patentees are not required by law, nor can they reasonably be expected, to do so.

■ Plaintiff's position is, in effect, that defendants, with their blocking and complementary patents, must be limited to a choice of the two foregoing alternatives, although no one would benefit from the first alternative, and the second would nullify or greatly impair the value of defendants' lawful monopoly powers. All of the aspects of defendants' agreement and of their activities of which plaintiff complains serve only to show that defendants have combined their patents in such a way as to maintain the monopoly powers conferred by the patents. This, in the opinion of the court, they were entitled to do.

■ Agreements for exclusive limited patent licenses are not illegal per se, although they do involve a restraint of commerce. United States v. General Elec. Co., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; Brownell v. Ketcham Wire & Mfg. Co., 9 Cir., 1954, 211 F.2d 121. That is so because the restraint arises from the patent grant and its lawful transfer. As stated in Bement v. National Harrow Co., 1902, 186 U.S. 70, 92, 22 S.Ct. 747, 756, 46 L.Ed. 1058:

"[The Sherman Act] clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or

licensee of a patent by the owner thereof, restricting the terms upon which the article may be used * * *."

■ The agreement in the instant case involves exclusive cross licenses, although in substance it is not far different from an exclusive licensing of all of Mesta's cooling bed patents to Birdsboro, with no license from Birdsboro to Mesta, but with a rather unusual provision for compensating Mesta for its licenses. Birdsboro was given the exclusive right to make and sell under all the patents, except that Mesta was, in effect, allowed to take a middleman's profit by having the exclusive right to sell cooling beds for merchant mills. The method for compensating Mesta does not restrain commerce any more than a more typical agreement for the payment of specified royalties. Cf. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. In considering the reasonableness of the provision, it must be remembered that cooling beds are not mass production items; their prices, specifications, dimensions, and uses vary greatly even in the narrow field of beds covered by Fisk and Peterson patents.

Viewing the agreement, however, as one of exclusive *cross* licensing, it is clear that such an agreement is not illegal per se and may even be desirable. In Standard Oil Co. v. United States, supra, the Court held, 283 U.S. at page 171, 51 S.Ct. at page 424:

"Where there are legitimately conflicting claims or threatened interferences, a settlement by agreement, rather than litigation, is not precluded by the Act. * * * An interchange of patent rights and a division of royalties according to the value attributed by the parties to their respective patent claims is frequently necessary if technical advancement is not to be blocked by threatened litigation."

In a footnote the Court stated:

"This is often the case where patents covering improvements of a basic process, owned by one manufacturer, are granted to another. A patent may be rendered quite useless, or 'blocked,' by another unexpired patent which covers a vitally related feature of the manufacturing process. Unless some agreement can be reached, the parties are hampered and exposed to litigation. And, frequently, the cost of litigation to a patentee is greater than the value of a patent for a minor improvement."

The dictum of the court in Blount Mfg. Co. v. Yale & Towne Mfg. Co., C.C., D. Mass., 1909, 166 F. 555, 557, is particularly applicable in this case:

"If, as a result of mutual licenses, there is put upon the market an article embodying the inventions of both patentees, so that as the effect of exchange of licenses a new article of commerce is developed, it is doubtful if the public is thereby unlawfully deprived of any of its rights or expectations of free competition."

■ Nor does any illegality inhere in the fact that the licenses granted are limited in their fields of use. See General Talking Pictures Corp. v. Western Elec. Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81; Extractol Process, Ltd. v. Hiram Walker & Sons, Inc., 7 Cir., 1946, 153 F.2d 264.

This court is not unmindful of the admonition of the Standard Oil case, supra, 283 U.S. at pages 169–170, 51 S. Ct. at page 423:

"[T]he necessary effect of patent interchange agreements, and the operations under them, must be carefully examined in order to determine whether violations of the Act result."

■ The agreement here involved is not an agreement between actual or potential competitors in the manufacture of beds of the types covered by the agreement. The court is well aware that cross licensing agreements have been used in some cases to fix prices, to extend patent monopolies to unpatented subject matter, to regiment an industry, or otherwise

to restrain lawful competition. See Brownell v. Ketcham Wire & Mfg. Co., supra. But no such illegality appears in this case.

Plaintiff contends that defendants have, under their agreement, given extraterritorial effect to United States patents. This contention is not supported by the evidence. Of course, beds manufactured in the United States for sale elsewhere would come within the terms of the agreement because such manufacture would come within the patent monopoly grants. See Becton, Dickinson & Co. v. Eisele & Co., 6 Cir., 1936, 86 F.2d 267, certiorari denied 1937, 300 U.S. 667, 57 S.Ct. 509, 81 L.Ed. 874. There is no evidence, moreover, of any consultation between defendants with respect to a patented bed which was not made and sold in the United States.

Plaintiff particularly complains of the provision of the 1942 agreement for the automatic inclusion of future cooling bed patents under the terms of defendants' agreement. Such provisions can be abused, just as many agreements lawful in themselves can be used unlawfully to restrain commerce. But no such abuse appears here, and provision for future patents is not unlawful per se. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563; Cutter Laboratories, Inc., v. Lyophile-Cryochem Corp., 9 Cir., 1949, 179 F.2d 80, 93; United States v. E. I. DuPont de Nemours & Co., D.C., D.Del., 1953, 118 F. Supp. 41, 224–225, probable jurisdiction noted, 1955, 348 U.S. 806, 75 S.Ct. 41, 99 L.Ed. 637.

Plaintiff relies strongly upon United States v. Line Material Co., 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, and cases following it, e.g., United States v. New Wrinkle, Inc., 1952, 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417. Line Material involved the problem of price fixing pursuant to patent cross licensing agreements, in the light of United States v. General Elec. Co., supra, following Bement v. National Harrow Co., supra. Of the eight justices who considered the Line Material case, the four concurring justices thought that General Electric should be overruled insofar as it related to price fixing, the three dissenting justices thought that it and Bement should be followed, and Justice Reed, who delivered the opinion of the Court, thought that General Electric should be distinguished. None of the opinions in Line Material suggests the overruling of Standard Oil Co. v. United States, supra, which held that a cross license between mutually deadlocked complementary patents is, per se, a desirable procedure. Clearly the *ratio decidendi* of Line Material lay in price fixing, not in cross licensing. As stated in the opinion of the Court, 333 U.S. 315, 68 S.Ct. 564:

"It is not the cross-licensing to promote efficient production which is unlawful. * * * The unlawful element is the use of the control that such cross-licensing gives to fix prices."

There is no evidence of price fixing in this case. The only agreement regarding prices is contained in paragraph 5 of the 1942 agreement, which provides that if the prices at which Birdsboro shall sell cooling beds for merchant mills to Mesta for resale are not low enough to enable Mesta "to sell in competition with equipment offered by others", Mesta may build such beds itself or have them built by others. Such an agreement tending to suppress prices of cooling beds for merchant mills to a competitive level is clearly in furtherance of, rather than in opposition to, the purposes of the Sherman Act. Of course, in the field of cooling beds for semi-finished products, Birdsboro was given all the patent rights and there was no cross licensing to Mesta.

In the opinion of the court, this case must be decided in accordance with Cutter Laboratories, Inc., v. Lyophile-Cryochem Corp., supra, in which the cross licensing arrangement which the Ninth Circuit upheld seems to have been very similar to that involved here, except that the arrangement in that case would seem

to offer a greater opportunity for restraint of commerce than is evidenced here. The court held, 179 F.2d at page 93:

"But conceding the patent pool did place in the hands of the parties a power to exclude competition from the industry by fixing prices or charging unreasonable royalties or other methods, that power by itself could not constitute unlawful monopolization unless accompanied by a purpose or intent to exclude competition."

In the instant case defendants have not, through their agreement, either acquired a power or evidenced an intent to exclude competition from the cooling bed industry. Cf. United States v. Associated Patents, Inc., D.C., E.D.Mich., 1955, 134 F.Supp. 74, affirmed per curiam sub nom. Mac Investment Co. v. United States, 76 S.Ct. 432. Rather, they have served to increase competition in the cooling bed industry by facilitating the production of beds which could not otherwise have been produced, in an industry of which their Fisk-Peterson beds represent a minor part of the total production. Application of the "rule of reason", cf. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 400–401, 68 S.Ct. 525, 92 L.Ed. 746, to the evidence in this case does not lead to the conclusion that competition has been unlawfully restrained.

 As stated in the Cutter Laboratories case, supra, 179 F.2d at pages 92–93:

"Patent pools and cross-licensing agreements, when formed in a legitimate manner for legitimate purposes, are not illegal in themselves. * * * Nor is an agreement to assign patents on future inventions within a specified field inherently illegal. * * * It is only where the agreements are used to effect a restraint of trade or a monopoly that they violate the law, as where they are used to fix prices, * * * or to suppress competition from unpatented articles, * * * or to monopolize an entire industry by pooling the dominating patents and allocating fields of manufacture among companies which would otherwise be in competition. * * *

* * * * *

"It must be remembered that the patent laws give the patentee a monopoly. He may make, use or sell the patented product, license others, on an exclusive or non-exclusive basis, to do so, authorize the issuance of sublicenses, or assign the patent itself for a consideration. The sole limitation is, that he must not use his legitimate patent monopoly as a means of suppressing competition or acquiring a monopoly outside of the area of monopoly which the patent grants. The legality of the agreements in this case depends, therefore, upon a comparison of the competitive situation which they create with the patent monopolies which each party would have in the absence of the agreements. * * * It is consistent with the spirit, as well as the letter, of the patent laws that each of these two companies should arrange to use the other in order to reap the rewards to which it is entitled as patentee and yet which it is in no position to reap by itself."

For the foregoing reasons, and upon full consideration of all the contentions of the parties and of the evidence, this case must be adjudicated in accordance with the following:

Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of this action.

 2. The defendants have not combined or conspired to restrain interstate or foreign trade as alleged in the complaint in violation of the Sherman Act.

 3: The agreement between the defendants dated August 12, 1942, is,

and since its date has been, the only subsisting agreement between the defendants relating to the manufacture and sale of cooling beds. Said agreement is lawful and does not violate the Sherman Act. The defendants have not used patent rights in violation of the Sherman Act.

4. The plaintiff is not entitled to any relief prayed for in its complaint. This action should be dismissed.